**UNITED STATES of America**

v.

**Michael DALY.**

**Criminal Action No. 96–93.**

United States District Court,
E.D. Pennsylvania.

Aug. 7, 1996.

Burton A. Rose, Philadelphia, PA, for Michael Daly.

Frank C. Barbieri, Jr., U.S. Attorney's Office, Philadelphia, PA, for U.S.

### *ORDER–MEMORANDUM*

EDUARDO C. ROBRENO, District Judge.

**AND NOW,** this **7th** day of **August, 1996,** upon consideration of defendant's Motion to Sever Counts I and II (doc. no. 13), defendant's Motion to Suppress Evidence (doc. no. 14), the responses and the supplemental submissions thereto (doc. nos. 15, 21, 22, 25, 33, & 34), following an evidentiary hearing on July 17–18, 1996, it is hereby **ORDERED** that the motions are **DENIED** on the terms set forth below:

## I. FACTUAL AND PROCEDURAL BACKGROUND

1. Defendant Michael Daly ("Daly") was charged by a grand jury with two counts of possessing cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), at two separate locations in Philadelphia, Pennsylvania, on November 21, 1995, and on January 20, 1996. He moves this Court to suppress evidence which he claims the Government seized in violation of his rights under the Fourth Amendment to the United States Constitution.

2. Daly contends "that there did not exist a substantial basis for the issuing authority to believe that contraband would be found at the [defendant's apartment at the Hill Tower Apartments] on November 21, 1995," Def.'s Mot. to Suppress, doc. no. 14, at ¶ 4, that the affidavit in support of the search warrant presented materially false and misleading information which affected the issuance of the warrant, and that the detectives lacked exigent circumstances to enter and search his apartment on that date. With respect to the search of the apartment at 11909 Academy

Road on January 20, 1995, Daly argues that the detectives lacked probable cause and that they acted in bad faith, since they searched the apartment before the search warrant was signed and never delivered the warrant to the premises.

### A. *The Hill Tower Apartment*

3. The first part of defendant's motion to suppress concerns the evidence seized on Daly's person and in Daly's apartment at the Hill Tower Apartments on November 21, 1995. The search warrant for Daly's apartment is based on the sworn affidavit of Philadelphia County Detective Michael J. Reynolds ("Reynolds"), who is employed by the Philadelphia District Attorney's office, Dangerous Drug Offender Unit, and who possesses extensive experience and training in the legal enforcement of narcotics trafficking.

4. Reynolds attests that on November 20, 1995, he was called by Montgomery County Narcotics Unit Detective Tony Spagnoletti ("Spagnoletti"), whom Reynolds had personally known for three years. Spagnoletti had received information from a confidential informant ("CI") regarding the activities of Daly. Spagnoletti represented to Reynolds that the CI had provided him with accurate narcotics–related information in the past.[1]

5. The CI had informed Spagnoletti that Daly made trips to Florida at least once a month to purchase cocaine with his brother, William Daly, or with an associate, Thomas Craig Reilly ("Reilly"). Further investigation by Spagnoletti revealed that William Daly had been arrested on cocaine charges on July 23, 1995. Spagnoletti himself had arrested Reilly on January 11, 1994, on charges of delivering marijuana.

6. In addition, the CI identified the vehicles owned by Daly and described specifically the method by which Daly conducted drug transactions with his customers. The CI told Spagnoletti that Daly was often high on cocaine. Because the CI had also observed

handguns and a shotgun owned by Daly, he was to be considered armed and dangerous.

7. On November 16, 1995, Spagnoletti was informed by the CI that Daly and Reilly were in Florida purchasing a large quantity of cocaine and that Daly would return in several days. On November 20, 1995, at approximately 1:30 p.m., the CI told Spagnoletti that Daly and Reilly had returned from Florida with a large quantity of cocaine and that an individual with whom the CI was personally acquainted had observed the cocaine and a large sum of money inside Daly's apartment. Later that day, the CI called Daly at his apartment and had a drug-related conversation during which Daly admitted to having a large quantity of cocaine for sale.

8. After receiving this information from Spagnoletti, Reynolds dialed a digital display pager telephone number that had been provided to Spagnoletti by the CI. A few minutes later, a person identifying himself as "Mike" called Reynolds back. Reynolds' attempt to discover with the aid of Caller ID the number from which "Mike" had returned his call revealed that the number was a "private" listing and that the listing for Michael Daly's telephone number at the Hill Tower apartment was also unpublished.

9. That evening, Reynolds traveled to the Hill Tower apartment complex with the CI and another detective, at which time the CI reiterated his information concerning Daly. The CI then identified another vehicle belonging to Daly which was parked in the lot of the apartment complex.

10. On November 21, 1995, at approximately 3:05 p.m., surveillance units at the Hill Tower complex observed a male fitting the description of Daly arrive and park one of the vehicles described by the CI. A check revealed that the vehicle was registered to Daly. The male, identified as Daly, entered the apartment building and proceeded up to the sixteenth floor.

11. At approximately 3:30 p.m., the detectives observed Daly exiting the building and

---

1. In addition, Spagnoletti also told Reynolds that he had received information from another confidential informant during the summer of 1994 regarding the drug-related activities of Daly and his brother, William Daly. Because this informa-

tion was over a year old at the time of the affidavit and because the Court finds that the information from the CI was sufficient for a finding of probable cause, it has not been taken into account in the Court's calculus of this case.

approached him as he was walking toward his vehicle. When the detectives identified themselves as police, Daly fled on foot and left his jacket behind. He was apprehended by the detectives in the parking lot. A subsequent search of the jacket resulted in the confiscation of small quantities of marijuana and cocaine.

12. Detectives then proceeded to Daly's sixteenth floor apartment, number 16B, fearing that other persons were in the apartment and had observed the apprehension of Daly in the parking lot, in order to secure the premises before executing a search. There, they observed drug paraphernalia in plain view. All these activities and observations, including the events after Daly's exit from the building, were included in Reynolds' affidavit.

13. At the evidentiary hearing on July 17–18, 1996, several witnesses testified regarding the events leading up to Daly's November 21 arrest, including Reynolds, Spagnoletti, the detectives at the Hill Tower apartment complex, Reilly, Ed Bradley (an innocent bystander who observed the arrest), Daniella Desiderio (Daly's friend), Joseph McCarrick (Daly's friend), and Daly himself. Reilly testified that he had never travelled to Florida with Daly and that he had never been involved in drug trafficking activities with Daly. Desiderio and McCarrick testified that they had seen Daly in Pennsylvania on November 18, 1995; however, Daly revealed that he had been in Florida from November 12 to 14. Reynolds testified that he began preparing his affidavit in support of the warrant earlier on the day of November 21, 1995.

14. The detectives' testimony revealed that they had begun their surveillance of the Hill Tower apartment complex at approximately 11:00 a.m. Moreover, the four detectives who had set up surveillance had been wearing plain clothes and had been driving an Acura Legend and a BMW. In addition, when the detectives "approached" Daly to speak with him, they drove the BMW immediately behind Daly's vehicle and effectively "blocked" his car into its parking space. Daly had not yet entered the vehicle and immediately fled on foot, under the belief, according to Daly, that he was being accosted by drug dealers, not police officers.

15. After the detectives apprehended Daly, two of them accompanied him to the BMW, where they awaited the issuance of the search warrant. Believing that Reilly may have been in Daly's apartment and could have destroyed evidence while in the apartment, the other two detectives went upstairs to secure the apartment, where they observed drug paraphernalia in plain view. Defendant produced photographs which revealed that a person in the apartment could not see activity in the parking lot unless he or she were standing outside on the balcony.

16. The search warrant was signed by the issuing authority at approximately 4:35 p.m., whereupon Reynolds contacted the detectives at the scene and informed them they could commence their search. Reynolds himself arrived with the warrant at approximately 5:10 p.m., by which time the search of apartment 16B was nearly completed.

### B. *The Academy Road Apartment*

17. The second half of defendant's motion to suppress concerns the evidence seized at the apartment at 11909 Academy Road on January 20, 1996. The search warrant for this apartment was also based on the sworn affidavit of Detective Reynolds.

18. After Daly was arrested on November 21, 1995, he posted bail on December 7, 1995, but failed to appear for his preliminary hearing five days later. A bench warrant was issued for his arrest.

19. On January 11, 1996, Reynolds was first contacted by Special Agent Judith Tyler ("Tyler"), with whom Reynolds had previously worked in her capacity as a narcotics investigator with the Federal Bureau of Investigation. Tyler had called to inquire whether Daly was a fugitive in Philadelphia. She informed him that a confidential source ("CS"), who was known by her to be accurate and reliable, had told her that he knew Daly.

20. The CS stated that Daly had dyed his hair and was seeking false identification in order to elude law enforcement authorities. The CS also told Tyler that Daly was planning to travel by car to Florida on January

12, 1996, in order to obtain cocaine for distribution in Philadelphia, that Daly would return to Philadelphia on January 15, 1996, and that this was Daly's modus operandi for acquiring cocaine. The CS later informed Tyler that, sometime between January 15 and January 18, Daly had told the CS that he had cocaine available for sale.

21. Furthermore, the CS stated that he knew the specific telephone number at which Daly could be contacted, since he had spoken with Daly at that number sometime within the week preceding January 20, 1996. Reynolds' subsequent check of the number with the telephone company revealed that the phone was subscribed under the name of David Meckling, at 11909 Academy Road, first floor apartment, Philadelphia, Pennsylvania.

22. Finally, the CS described one of the vehicles driven by Daly. Reynolds' later investigation of the vehicle, however, revealed that it was not registered under Daly's name. Yet, when Reynolds visited the 11909 Academy Road location on January 19, 1996, he saw the same vehicle in the rear parking lot of the building.

23. On January 20, 1996, Reynolds and other members of his unit set up surveillance at 11909 Academy Road in an attempt to arrest Daly on his outstanding warrant. At approximately 12:00 p.m., the detectives observed Daly exit the rear of the building and enter a vehicle that did not match the description of the one identified by the CS. Shortly thereafter, Daly was arrested a few blocks away from the apartment building. A search of his person incident to the arrest resulted in the seizure of approximately one ounce of cocaine.

24. Other detectives then proceeded to the first floor apartment at 11909 Academy Road and informed the occupants that the police were going to obtain a search and seizure warrant for those premises. All these activities and observations, including the events after Daly's arrest, were included in Reynolds' affidavit in support of the search warrant.

25. At the evidentiary hearing on July 17–18, 1996, additional details regarding these events were brought to the Court's attention. The testimony primarily involved two issues: the identity of Tyler's confidential source[2] and the sequence of events involving the search of the first floor apartment.

26. Daly produced several witnesses who testified that the apartment had been searched prior to the signing of the search warrant at approximately 3:15 p.m. Among the individuals who testified regarding this search were Sharleen Angelastro, the acting assistant manager of 11909 Academy Road who had been conducting an "open house" viewing of another apartment in the building that day, Jonathan Allebach, Ms. Angelastro's fiance who had come to assist her with the open house and to escort her home, and Susan DiGregorio, Daly's girlfriend who had been visiting Daly in the Academy Road apartment when it was secured and searched by the police.

27. Ms. Angelastro testified that, prior to entering the apartment, the police had knocked and identified themselves as "management," not as the police. She further testified that she had entered the apartment while the police were present, and had observed that the apartment had been "turned upside down," in that she had seen a ripped mattress, tiles that had fallen off the ceiling, and sofa cushions and fish tank rocks on the floor. In addition, she had observed an item of furniture resembling a large wash basin being removed at approximately 1:00 or 1:30 p.m. that day, and was certain that the apartment had been "ransacked" before 2:30 that afternoon. She left work that day at 3:20 p.m.

28. Her fiance, Mr. Allebach, testified that, although he had seen nothing taken out

---

**2.** The revelations at the evidentiary hearing of the identity of the confidential source and of his transaction with Daly for one ounce of cocaine further support the Government's argument that its agents possessed probable cause to search on January 20, 1996. These facts are, however, irrelevant to the issue of whether the *issuing authority* had reason to believe that contraband would be found at that location and on that date, since these details were not included in Detective Reynolds' affidavit. Therefore, the Court will not address these facts in detail.

of the apartment, he had heard noises of objects being moved around inside the apartment. He also testified that he had heard the police identify themselves as "management." Furthermore, he corroborated Ms. Angelastro's departure time as 3:20 p.m., having left the building with her.

29. Defendant's third witness, Ms. DiGregorio, likewise testified that the police had identified themselves as "management" when they knocked, but that, when she opened the door, she saw police officers and drug enforcement agents. She also stated that as soon as the police entered the apartment, they began looking around, and that, in her opinion, the search was finished by 2:30 p.m. She testified that the police never showed her a search warrant and spent several hours snacking and watching television in the apartment, while she sat on the living room floor. The fact that the search warrant never arrived at the premises was corroborated by the Government's witnesses, who had given a copy of the warrant to Daly at the police station.

30. Ms. DiGregorio, however, admitted to having been "pretty drunk" at a party held in the apartment the previous evening and that as a result she had been "messed up" when the police appeared the following day. She also testified that she was not a resident of the apartment, but had merely been visiting Daly for the weekend. Moreover, she admitted that, when the police first asked her for her name, she had given them a false name.

## II. DISCUSSION

### A. *Probable Cause and Search Warrants*

31. The Fourth Amendment to the United States Constitution provides that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Amendment "protect[s] the basic right to be free from unreasonable searches and seizures" and "requir[es] that warrants be particular and supported by probable cause." *Payton v. New York*, 445 U.S. 573, 584, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980). It is clear that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 585, 100 S.Ct. at 1379–80 (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)).

32. "The Fourth Amendment contains no provision expressly precluding the use of evidence obtained in violation of its commands, and an examination of its origin and purposes makes clear that the use of fruits of a past unlawful search or seizure works no new Fourth Amendment wrong." *United States v. Leon*, 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984) (citing *United States v. Calandra*, 414 U.S. 338, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974)) (internal quotations omitted). Enforcement of the Fourth Amendment thus depends upon judicial application of the exclusionary rule. "The rule ... operates as a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 906, 104 S.Ct. at 3412 (citing *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620) (internal quotations omitted). Application of the exclusionary rule requires that evidence obtained during a search or seizure violative of the Fourth Amendment must be suppressed, unless the actions of the government agents fall under one of the judicially sanctioned exceptions to the exclusionary rule.

33. The test to determine whether probable cause exists to support the issuance of a search warrant is the totality-of-the-circumstances approach. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). The Supreme Court has defined "probable cause" as "a fair probability that contraband of evidence of a crime will be found in a particular place." *Id.* Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully,

reduced to a neat set of legal rules." *Id.* at 232, 103 S.Ct. at 2329. Among the factors that are relevant, but not necessarily dispositive, to a court's determination of probable cause under this approach are the reliability of an informant, the informant's basis of knowledge, corroboration of information through other sources, an informant's predictions of future plans, and the level of detail of the information provided.

If, for example, a particular informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause based on his tip. Likewise, if an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis of his knowledge unnecessary. Conversely, even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case. Unlike a totality-of-the-circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tip, the "two-pronged test" [the former approach which required proof of the veracity and the basis of knowledge of an informant] has encouraged an excessively technical dissection of informants' tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts presented to the magistrate.

*Id.* at 233–34, 103 S.Ct. at 2329–30.

34. In applying the totality-of-the-circumstances approach to adjudicate motions to suppress evidence for lack of probable case to support a search warrant, the Third Circuit, like the Supreme Court, has cautioned against the application by a reviewing court of "an unduly narrow standard for evaluating probable cause." *United*

States v. Conley, 4 F.3d 1200, 1203 (3d Cir. 1993), *cert. denied,* 510 U.S. 1177, 114 S.Ct. 1218, 127 L.Ed.2d 564 (1994).

[T]he district court [may] exercise only a deferential review of the *initial* probable cause determination by the magistrate. A magistrate's determination of probable cause should be paid *great deference* by reviewing courts. The duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place, a reviewing court is to uphold the warrant as long as there is substantial basis for a fair probability that evidence will be found.

*Id.* at 1205 (citing *Gates,* 462 U.S. at 236–38, 103 S.Ct. at 2330–2331) (internal quotations omitted). "[A] reviewing court may not conduct a *de novo* review of a probable cause determination. Even if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." *Id.* (citing *Gates,* 462 U.S. at 236, 103 S.Ct. at 2331).

35. With respect to probable cause supporting the issuance of search warrants, the Third Circuit has further noted that "courts ... must bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found. The affidavit in support of a warrant need not present information that would justify the arrest of the individual in possession of or in control of the property." *Id.* at 1207 (citing *United States v. Tehfe,* 722 F.2d 1114, 1117–18 (3d Cir.1983), *cert. denied,* 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984)).

36. "Direct evidence linking the place to be searched to the crime is not required for the issuance of a search warrant. Instead, probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and

normal inferences about where a criminal might hide stolen property." *Id.* (citations omitted). Moreover, the Third Circuit has held that, even when a reviewing court may find innocuous explanations for each detail in an informant's tip, the issuing authority is entitled to infer that, when viewed together, the details give rise to a belief that evidence of illegal activity will more likely than not be found on the premises to be searched. *United States v. Williams,* 3 F.3d 69, 73 (3d Cir.1993). Thus, the district court's role in making probable cause determinations on affidavits in support of applications for search warrants is "quite limited." *Conley,* 4 F.3d at 1205.

▇ 37. Consistent with the limited role of a reviewing court on a motion to suppress, the Third Circuit has provided that, in a case where certain factual averments in a supporting affidavit may be "tainted" by police misconduct, those averments do not necessarily vitiate a warrant which is otherwise supported by probable cause reflected in the affidavit. *United States v. Herrold,* 962 F.2d 1131, 1138 (3d Cir.), *cert. denied,* 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992). The proper procedure under such a set of facts is to examine the affidavit for probable cause after excising the tainted averments.[3] *Id.*

▇ 38. Furthermore, the Third Circuit has noted two exceptions to the exclusion of evidence that was improperly obtained.[4] The inevitable discovery doctrine permits introduction of "evidence that *inevitably would have* been discovered through lawful means, although the search that actually led to the discovery of the evidence was unlawful." *Id.* at 1140. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [in deterring police misconduct] has so little basis that the evidence should be received." *Id.* at 1139 (quoting *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984)).

▇ 39. In contrast, under the independent source doctrine, "evidence that was *in fact* discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible." *Id.* at 1140. "The interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a *worse* position, that they would have been in if no police error or misconduct had occurred.... When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id.* at 1139 (quoting

3. The Court notes that defendant has failed to make even a "preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant" to necessitate a *Franks* hearing. *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978). Moreover, at the evidentiary hearing, defendant failed to show "by a preponderance of the evidence that material statements in the affidavit [were] either recklessly or intentionally untruthful." *United States v. Brown,* 3 F.3d 673, 676–77 (3d Cir.) (citing *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676), *cert. denied,* 510 U.S. 1017, 114 S.Ct. 615, 126 L.Ed.2d 579 (1993).

For example, although testimony at the evidentiary hearing revealed that Daly had been in Pennsylvania on the days during which the CI had said he would be in Florida, Daly's own testimony revealed that he had been in Florida from November 12 to 14. Such a minor inaccuracy involving the actual dates when Daly was in Florida is not sufficient under *Franks* to demonstrate that Reynolds had been deliberately or

recklessly untruthful. *See id.* at 677 (affirming district court, in case where affidavit was based solely on an informant's tip, without any information regarding independent police investigation, and where the district court found that inaccuracies raised by the defendants' offer of proof at the *Franks* hearing "failed to show the *affiant's* deliberate or reckless untruthfulness but simply impeached the veracity of the *informant*").

4. Because the Court finds that both warrants were supported by probable cause, it need not examine the exception to the exclusionary rule under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), where fruits of a search are not suppressed when officers obtain and execute a search warrant on the "good faith" belief that the warrant is valid and the warrant is later found to be invalid. *See also Maryland v. Garrison,* 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) (reaffirming "good faith" exception when officers searched wrong apartment under search warrant).

*Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988) (quoting *Nix,* 467 U.S. at 443, 104 S.Ct. at 2509)).

40. The key distinction between these doctrines is that independent source "focuses on what actually happened," whereas inevitable discovery "considers what would have happened in the absence of the initial [illegal] search." *Id.* Both doctrines are relevant to the instant case.

■■■■ 41. Additionally, the Court notes that law enforcement officials may enter and secure apartments from within if they act on probable cause and under exigent circumstances. *Segura v. United States,* 468 U.S. 796, 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599 (1984). "[A]s a practical matter, officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry." *Id.* at 812, 104 S.Ct. at 3389. "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732 (1984).

■■■■ 42. Finally, with respect to the physical presence of search warrants at the place to be searched, Federal Rule of Criminal Procedure 41(d) provides that "[t]he officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken." Fed.R.Crim.P. 41(d). "Nothing in the fourth amendment or Rule 41 requires that the search warrant be physically present prior to commencing the search." *United States v. Hepperle,* 810 F.2d 836, 839 (8th Cir.) (citing, *inter alia, Katz v. United States,* 389 U.S. 347, 355 n. 16, 88 S.Ct. 507, 513 n. 16, 19 L.Ed.2d 576 (1967)), *cert. denied,* 483 U.S. 1025, 107 S.Ct. 3274, 97 L.Ed.2d 772 (1987).

## B. *Reasonable Suspicion and Terry Stops*

■■■■ 43. The case law regarding the authority of law enforcement officers to stop and temporarily detain citizens short of an arrest is well-settled. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As the Third Circuit most recently stated, "[u]nder *Terry,* a police officer may detain and investigate citizens when he or she has a reasonable suspicion that criminal activity may be afoot." *United States v. Roberson,* 90 F.3d 75, 77 (3d Cir.1996) (citing *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884).

■■■ In *Roberson,* where the police officers received an anonymous tip that the defendant was a drug-dealer, but observed only innocent activity on the part of the defendant before stopping him, the Third Circuit held that "the police do not have reasonable suspicion for an investigative stop when … they receive a fleshless anonymous tip of drug-dealing that provides only readily observable information, and they themselves observe no suspicious behavior." *Id.* at 80. The court went on to note, however, that the police officers could have engaged in a variety of activities which may have given rise at least to a reasonable suspicion to stop the defendant:

> We note that the government was not powerless to act on the non-predictive, anonymous tip they received. The officers could have set up surveillance of the defendant. If the officers then observed any suspicious behavior or *if they had observed suspicious behavior as they approached the defendant* in this case, they would have had appropriate cause to stop—and perhaps even arrest—him.... In the absence of any observations of suspicious conduct or the corroboration of information from which the police could reasonably conclude that the anonymous tipster's allegation of criminal activity was reliable, we must conclude that there was no reasonable suspicion to stop the defendant.

*Id.* (citation omitted) (emphasis added).

■■■■ 45. In *United States v. Edwards,* where the defendant's car, with the defen-

dant still inside it, had been boxed in by two police vehicles "to prevent or inhibit an escape attempt," and where the police approached the vehicle with their weapons drawn, the Third Circuit held that "the police acted reasonably in blocking the suspects' vehicle to conduct a brief investigation." 53 F.3d 616, 620 (3d Cir.1995).

> [W]hen police officers make an investigative stop, they may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. Under the *Terry* cases, the reasonableness of the intrusion is the touchstone, balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect.

*Id.* at 619 (internal quotations and citations omitted). In addressing the defendant's contention that he was not "free to leave" and that the officers' actions therefore amounted to an arrest, the court noted that "[c]learly a *Terry* stop is a seizure, and one seized is by definition not free to leave." *Id.* at 620. The court concluded that "police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *Id.* at 619.

### C. The Events at the Hill Tower Apartment

46. In the instant case, the Court finds that both search warrants were supported by probable cause. With respect to the events which occurred at the Hill Tower location, defendant argues that his detention in the parking lot and the detectives' subsequent activities violated his rights under the Fourth Amendment.

47. Even if the Court were to excise the information in Detective Reynolds' affidavit pertaining to the stop of defendant, the evidence recovered from his jacket, and the evidence seen in plain view during the securing of the apartment, the affidavit would support a finding of probable cause. Detective Reynolds is an experienced law enforcement official familiar with the operations of narcotics traffickers. Moreover, the confidential informant provided specific and detailed information regarding the travel plans of Daly, his modus operandi in conducting drug transactions, the vehicles he drove, drug-related conversation between him and Daly, and his pager number. As for Daly's trips to Florida, "[i]n addition to being a popular vacation site, Florida is well-known as a source of narcotics and other illegal drugs." *Gates,* 462 U.S. at 243, 103 S.Ct. at 2335. While the Court notes that each detail provided by the CI may have appeared innocuous standing alone, when the facts are read as a whole under the requisite deferential standard of review, they could provide the issuing magistrate with a minimal substantial basis for finding probable cause.

48. Furthermore, the Court notes that the search of the Hill Tower apartment did not commence until after the warrant was signed at 4:35 p.m. Therefore, the evidence recovered from that search would be admissible under the independent source doctrine, as "evidence that was in fact discovered lawfully, and not as a direct or indirect result of illegal activity." *Herrold,* 962 F.2d at 1140.

49. Yet, the Court finds that excision of the information uncovered as a result of the events which occurred after Daly exited the building is unnecessary. Although the police vehicle effectively boxed Daly's car into its parking space, the Third Circuit has clearly stated that such activity is reasonable under a *Terry* stop. Since the Court has concluded that the information which the detectives possessed prior to approaching Daly was sufficient to constitute probable cause, it is axiomatic that the detectives had reasonable suspicion under *Terry* that criminal activity was afoot.

50. In addition, the Court notes that Daly abandoned his jacket in the parking lot in the course of his flight from the detectives. In discarding his jacket, Daly "relinquished his reasonable expectation of privacy in it and his standing to oppose its subsequent acquisition by the police." *United States v. Anderson,* 754 F.Supp. 442, 445 (E.D.Pa.1990) (Van Antwerpen, J.) (holding same, where defendant threw away gun dur-

ing flight from police), *aff'd*, 947 F.2d 937 (3d Cir.1991), *cert. denied*, 503 U.S. 923, 112 S.Ct. 1302, 117 L.Ed.2d 524 (1992); *see also United States v. Embry*, 546 F.2d 552, 557 (3d Cir.1976) ("One who abandons personal property may not contest the constitutionality of its subsequent acquisition by the police.") (citation omitted), *cert. denied*, 430 U.S. 948, 97 S.Ct. 1587, 51 L.Ed.2d 797 (1977); *cf. United States v. Coggins*, 986 F.2d 651, 653 (3d Cir.1993) ("[W]hen the abandonment of property is precipitated by an unlawful seizure, that property also must be excluded.").

51. Lastly, the detectives' belief that someone inside the apartment could have observed Daly's detention and destroyed critical evidence constituted an exigency that justified their entry into the apartment. Although defendant's photographs demonstrate that an observer could have seen the parking lot only if he or she had been standing on the balcony of apartment 16B and subsequent events revealed that there in fact had been no one inside the apartment, the Court finds that such information, while possessing the wisdom of hindsight, does not undermine the exigency which existed on November 21, 1995. Defendant also argues that the exigency was "self-created." The Court, however, fails to see in what manner the decision of the detectives to stop Daly under *Terry* detracts from their concern that someone in the apartment may destroy key evidence.

52. In summary, even if the Court were to excise the information regarding the events which occurred after Daly exited from Hill Tower, the Court concludes that the confidential informant provided enough information in sufficient detail and with sufficient corroboration to support a finding of probable cause by the issuing authority. Yet, the Court finds that such excision is not necessary, since the evidence from Daly's jacket was recovered from discarded or abandoned property and the evidence in plain view was observed during an attempt by the detectives to secure the apartment with probable cause and under exigent circumstances.

## D. *The Events at the Academy Road Apartment*

53. With respect to the events at the Academy Road location on January 20, 1996, the Court notes that, as a preliminarily matter, Daly was properly arrested on an outstanding warrant. The Court further finds, however, that the affidavit in support of the application for a search warrant at that location was also supported by probable cause.

54. Agent Tyler's confidential source provided numerous details regarding Daly's person and his activities. The CS was sufficiently acquainted with Daly to know that Daly had dyed his hair and that Daly was seeking false identification in order to elude the authorities on his outstanding arrest warrant. The CS also knew of Daly's future plans to travel to and from Florida in order to acquire more cocaine. In addition, the CS knew the telephone number at which Daly could be reached and the vehicle which Daly was then driving. Detective Reynolds' subsequent check of the phone number revealed that it was registered to the first floor apartment at 11909 Academy Road. Reynolds' visit to those premises revealed that the vehicle described by the CS was parked in the lot. Finally, on January 20, 1996, surveillance units observed Daly himself exiting the rear of the building at 12:00 p.m. A search incident to Daly's arrest resulted in the seizure of one ounce of cocaine from Daly's person.

55. Based on all of these details and the subsequent corroboration by the police, the Court concludes that an issuing authority could believe that there was a fair probability that contraband or evidence of a crime would be found in that particular place. Moreover, upon considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property, the issuing authority could infer that drugs and drug paraphernalia could be found at the apartment where Daly was staying and eluding arrest.

56. Daly argues, however, that the first floor apartment at 11909 Academy Road was improperly searched before the search

 

warrant was ever signed. He produced several witnesses who testified that the apartment had been searched before the warrant was issued at 3:15 p.m.

57. Initially, the Court notes that a lay person's notion of a "search" differs from the legal concept of "search." Ms. DiGregorio testified that the police had entered the apartment and immediately began looking around. Yet, such behavior is entirely consistent with the method of securing the premises approved in *Segura.* Circumstances are especially exigent when law enforcement officials are aware of the presence of individuals inside the premises who could easily destroy evidence.

58. Although Ms. DiGregorio, Ms. Angelastro, and Mr. Allebach all stated that they heard the police identify themselves as "management," Ms. DiGregorio testified that, upon her opening the door, it became immediately apparent that they were police officers and drug enforcement agents. Defendant has not argued in what manner these activities were improper. *Cf. United States v. Acosta,* 965 F.2d 1248, 1253 (3d Cir.1992) (holding that announcement of "This is the police. Open the door. Let me in. I have a warrant," when in fact the police did not have a warrant for the premises, was neither "trickery" nor "subterfuge" in the context of the Fourth Amendment).

59. Finally, the Court notes that, even if the search occurred prior to the issuance of the search warrant,[5] the inevitable discovery doctrine would apply. Since the Government would have inevitably discovered the information by lawful means under the search warrant, a copy of which had been properly given to Daly, the rationale in deterring police misconduct has so little basis that the evidence should be received. Although the police did not have the actual list of items to be seized in the warrant, there was nothing unusual about a search for drugs and the attendant paraphernalia commonly associated with drug trafficking that was conducted by experienced narcotics detectives.

"While it may be foolhardy to proceed in the absence of the physical presence of the warrant, it is not unconstitutional." *Hepperle,* 810 F.2d at 839.

III. CONCLUSION

60. For the foregoing reasons, defendant's motion to suppress (doc. no. 14) is **DENIED.**

It is **FURTHER ORDERED** that defendant's motion to sever counts I and II (doc. no. 13) is **DENIED,** defendant having failed to satisfy his burden of demonstrating that he would be unduly prejudiced by the joinder of offenses at trial. *See* Fed.R.Crim.P. 14.

**AND IT IS SO ORDERED.**

---

5. Ms. Angelastro testified at great length regarding the untidy state of the apartment. The Court notes, however, that many of her observations are consistent with the results of police efforts to secure the premises. Moreover, Ms. DiGregorio's testimony that there had been a party in the apartment on the previous evening helps account for the conditions observed by Ms. Angelastro.