**UNITED STATES of America,**

v.

**Kenrick T. PRIMO, a/k/a "Theodore O. Primo", a/k/a "Shawn Parkinson", a/k/a "Magic".**

**No. CRIM. 3: 04–18J.**

United States District Court, W.D. Pennsylvania.

March 23, 2005.

---

Arthur T. McQuillan, Gleason, DiFrancesco, Shahade, Barbin, McQuillan & Markovitz, Johnstown, PA, for Kendrick T. Primo.

John J. Valkovci, Jr., Asst. U.S. Attorney, Johnstown, PA, for U.S.

### MEMORANDUM OPINION AND ORDER

GIBSON, District Judge.

### Findings of Fact and Conclusions of Law

This case comes before the Court on Defendant's Motion to Suppress Evidence (Document No. 21–1). Upon consideration of Defendant's Motion, the Response by the United States Government (Document No. 24), testimony and evidence from a Suppression Hearing held before the Court on February 22, 2005 and arguments set forth by counsel, the Court determines the following findings of fact and conclusions of law:

### I. Findings of Fact

1. On October 6, 2003, Somerset Borough Police Officer Clifford Pile (hereinafter "Pile") gathered information from Rent–A–Center manager, Bill Taylor (hereinafter "Taylor"), implicating Kenrick Primo, a/k/a "Theodore O. Primo", a/k/a "Shawn Parkinson", a/k/a "Magic" (hereinafter "Primo") in the alleged theft of a Toshiba television.

2. Taylor stated to Pile that Primo's co-lessee, Matt Flugan (hereinafter "Flugan"), allegedly stole the television, and the employee provided Pile with the television serial number, 82698089C.

3. Taylor also stated to Pile that Primo and Flugan shared a rental agreement for apartment 5 at 627 North Center Avenue, Somerset, Pennsylvania.

4. On October 6, 2003, Somerset Borough Police Officer McGuire (hereinafter "McGuire") contacted the landlord of 627 North Center Avenue, Somerset, Pennsylvania, and the landlord confirmed that Primo rented apartment 5, 627 North Center Avenue, Somerset, Pennsylvania.

5. Based upon this information, Pile and McGuire proceeded to apartment 5 in order to question the occupants of the apartment regarding the stolen Toshiba television.

6. After knocking on the door to apartment 5, Pile and McGuire determined that the occupants were not present.

7. Based upon information gathered from confidential informants, Pile and McGuire believed that Primo also rented apartment 2 at 627 North Center Avenue, Somerset, Pennsylvania.

8. Leaving apartment 5, Pile and McGuire proceeded to apartment 2 at approximately 5:36 p.m. After knocking on the door, the door was opened by a black male who identified himself as Sean Sherman, a/k/a "Akona Blount", a/k/a "Junior" (hereinafter "Sherman").

9. Pile explained to Sherman that the officers were looking for Primo.

10. Sherman advised the officers that Primo was not in apartment 2, but he would be returning shortly.

11. Pile and McGuire requested to wait for Primo inside apartment 2, and Sherman permitted the officers to wait inside apartment 2.

12. Pile and McGuire questioned Sherman about the stolen Toshiba television. Initially, Sherman denied any knowledge of the whereabouts of the television.

13. While waiting for Primo, the officers observed that Sherman acted nervously by pacing back and forth and by failing to make eye contact with the officers.

14. McGuire observed bulges in both of Sherman's front pockets. McGuire asked Sherman what was in his pant pockets.

15. Sherman was then observed mumbling, turning nervously away from the officers, and manipulating something in his pockets.

16. McGuire told Sherman he was going to pat him down to make certain that Sherman did not have any weapons in his pockets. During the pat down, McGuire felt a hard metallic object in Sherman's front right pocket.

17. Sherman attempted to put his left hand into his left pocket during the pat down. Immediately, McGuire directed Sherman to remove his left hand from his pocket.

18. Sherman refused to remove his left hand, and a struggle ensued as McGuire attempted to gain control of Sherman's left hand.

19. Pile joined the struggle, and Pile observed Sherman remove his left hand from his pocket and transfer something from his left hand to his right hand.

20. During the struggle, Pile, McGuire, and Sherman all fell to the floor. While on the floor, McGuire observed Sherman extend his right arm and reach for a heating vent on the floor.

21. Sherman placed his hand into the heating vent.

22. After securing Sherman, Pile recovered a clear plastic bag from the vent, which contained 13 individually wrapped pieces of an off-white, rock-like substance, consistent in appearance with crack cocaine.

23. Pile and McGuire then placed Sherman under arrest.

24. Back-up units arrived at apartment 2, 627 North Center Avenue, Somerset, Pennsylvania, and Somerset Borough Police Officer Deist (hereinafter "Deist") secured Sherman's wrists with handcuffs. Thereafter, officers searched Sherman and found a lock blade in his right front pocket and $588.00 in small bills on his person. All items, including the 13 individual suspected crack rocks, were logged into evidence.

25. While officers were arresting Sherman, Primo arrived home.

26. Officers explained the situation to Primo, and officers asked Primo, for his consent to search apartment 2.

27. Primo granted the officers consent to search apartment 2. Primo was also presented with a departmental consent-to-search form, and Primo was asked whether he could read and write the English language. Primo stated that he could.

28. The departmental consent-to-search form was then read to Primo.

29. Primo was asked whether he also rented apartment 5. Primo stated that he did rent apartment 5.

30. Pile added a search of apartment 5 to the departmental consent-to-search form. Primo was then asked to sign the form.

31. Primo indicated that Flugan also stayed in apartment 5, and Primo did not feel comfortable signing the form to consent to a search of apartment 5.

32. Primo was then asked whether he observed Flugan bring a Toshiba television into apartment 5. Primo stated that Flugan did bring a television into apartment 5.

33. McGuire explained to Primo that if he did not wish to sign the form, the officers would obtain a search warrant.

34. Primo signed the departmental consent-to-search form for both apartments 2 and 5.

35. In addition to Primo's consent to search, Pile and McGuire explained to Primo that they intended to obtain a search warrant for apartment 5 because Flugan was also staying in apartment 5, and he was not present to give his consent.

36. McGuire instructed Somerset Borough Police Officer Harbart (hereinafter "Harbart") to respond and secure apartment 5 while McGuire went to obtain a search warrant.

37. During this time, Deist was transporting Sherman to Somerset County, Pennsylvania, Station No. 80 to prepare formal charges against Sherman.

McGuire accompanied Deist to Station No. 80, and while en route, McGuire contacted an emergency medical unit to meet the officers at the station in order to check Sherman's cut to his hand sustained while putting his hand in the heating vent.

38. Upon arrival at Station No. 80, the medical unit determined that Sherman should be taken to the emergency room. At that time, Deist transported Sherman to the Somerset Community Hospital for treatment.

39. At approximately 8:30 p.m., McGuire returned to the Somerset Borough Police Station to draft an application for a search warrant for apartment 5. With Pile and Pennsylvania State Trooper Volk's (hereinafter "Tpr. Volk") assistance, McGuire spent approximately one hour drafting the affidavit and application for the search warrant.

40. This Application for Search Warrant and Authorization was designated with Warrant Control Number 100603–01 (hereinafter "Warrant No. 1"), as it was the first warrant issued on October 6, 2003.

41. Included in the Application for Warrant No. 1 is the name of the possessor of the premises to be searched: "Kenrick PRIMO and Matt Flugan". Flugan's name was handwritten next to Primo and inserted by Tpr. Volk during McGuire's preparation of the paperwork for Warrant No. 1. Pile also assisted McGuire by "relaying information back and forth . . . as to what was needed in preparation of that warrant." (Suppression Hearing, February 22, 2005, p. 91).

42. Also included in the Application for Warrant No. 1 were the following violations: Title 35, subsection 780–113A16–knowingly or intentionally possessing a controlled substance; and Title 18, subsection 3925(a), receiving stolen property.

43. McGuire stated during the Suppression Hearing that he included the search for controlled substance in the Application for Warrant No. 1 because it was believed that Sherman, who had drugs in his possession, also had access to apartment 5 since he was Primo's brother. (Suppression Hearing, February 22, 2005, p. 18).

44. The Affidavit of Probable Cause for Warrant No. 1 indicated a Warrant Control Number of 030321–01. McGuire acknowledged the warrant control number on the Affidavit was inaccurate because he printed this particular form from his personal computer without erasing the preexisting numbers on a previously saved document.

45. Included in the affidavit for Warrant No. 1 was the probable cause belief that the Toshiba flat screen television, serial number 82698089C, would be located in apartment 5, 627 North Center Avenue, Somerset, Pennsylvania. This probable cause belief that the stolen item would be located inside apartment 5 was based upon the following facts included in the affidavit prepared by McGuire:

a. McGuire is a trained and experienced police officer employed by Somerset Borough Police for approximately ten years, and during that time, McGuire was involved in over 100 stolen property investigations.

b. Taylor, a private citizen, revealed to Somerset Borough police officers that a crime of theft occurred wherein a 24 inch Toshiba flat screen television was stolen from Joseph Ryan Witt (hereinafter "Witt"), the individual who rented the television from Rent–A–Center. Taylor also advised Somerset Borough police officers that he received information from Joey Mitchell (hereinafter "Mitchell") that Flugan stole the television from Witt. Taylor revealed to officers that his records indicated that Flugan had previously rented items from Rent–A–Center, and that Flugan resided at apartment 5, 627 North Center Avenue, Somerset, Pennsylvania. Taylor also stated that his records revealed that Flugan resided at apartment 5, 627 North Center Avenue with Primo.

c. Through previous investigations and information supplied by confidential informants, McGuire established that Primo frequented apartment 2, 627 North Center Avenue, Somerset, Pennsylvania.

d. On October 6, 2003, McGuire and Pile went to apartment 2, 627 North Center Avenue, Somerset, Pennsylvania, and they spoke with the occupant of apartment 2. The occupant identified himself as Sean Sherman of Queens, New York, and Sherman revealed to McGuire that he was Primo's brother. Sherman also advised McGuire that Primo and Flugan shared apartment 5, and that Primo and Flugan had a violent altercation inside apartment 5 on October 5, 2003.

e. Sherman revealed to McGuire that Sherman believed that he observed the Toshiba flat screen television set inside apartment 5, 627 North Center Avenue, Somerset, Pennsylvania, and Sherman believed that the television was still located inside apartment 5.

46. Somerset County Assistant District Attorney Kathy Primavera read the Application and Affidavit for Warrant No. 1, and she approved the warrant as evidenced by her signature. The Affidavit is expressly incorporated by reference on the face of Warrant No. 1.

47. McGuire visited District Justice Cook's (hereinafter "District Justice Cook") home and presented District Justice Cook with the affidavit and application for the search warrant.

48. Upon reviewing the Application and Affidavit for Warrant No. 1, as well as McGuire's signature affirming that "certain property is evidence of or the fruit of a crime" and is located at apartment 5, 627 North Center Avenue, Somerset, Pennsylvania, District Justice Cook signed and approved the application for the search warrant at 9:30 p.m. on October 6, 2003, authorizing a nighttime search. (Application for Search Warrant and Authorization, Warrant Control Number: 100603–01).

49. While McGuire was preparing the search warrant to seize the Toshiba television believed to be located inside apartment 5 of 627 North Center Avenue, Harbart remained outside the door of apartment 5, securing the premises.

50. At the same time, Pile waited in between apartments 2 and 5 until McGuire returned with the properly approved and signed search warrant for apartment 5.

51. McGuire then contacted Pile, who remained at 627 North Center Avenue, to inform him that McGuire would soon return with a signed warrant.

52. Before returning to 627 North Center Avenue, McGuire was contacted by Deist, who requested that McGuire go to the Somerset Community Hospital prior to returning to 627 North Center Avenue.

53. At the hospital, Deist informed McGuire that he searched Sherman again, and Deist found a key in the right front watch pocket of Sherman's pants. Sherman informed Deist that the key unlocked apartment 5 at 627 North Center Avenue.

54. McGuire took possession of the key and returned to 627 North Center Avenue.

55. Upon his return to 627 North Center Avenue, McGuire was met by Pile, Harbart, and Pennsylvania State Police Sergeant Deluca (hereinafter "Sgt. Deluca"). McGuire verified with Harbart that

no one had entered or exited apartment 5 since McGuire's departure.

56. McGuire knocked on apartment 5 and loudly announced "Somerset Police, Search Warrant". After waiting approximately 45 seconds, McGuire knocked, announced, and advised any occupants inside apartment 5 that the officers were entering.

57. McGuire inserted the key retrieved from Sherman into the lock of apartment 5. The key fit and unlocked the dead bolt lock to apartment 5.

58. Warrant No. 1 was executed at approximately 10:00 p.m. by McGuire, Pile, Harbart, Sgt. Deluca, and Tpr. Volk. After announcing their presence, the officers began to clear the apartment. No one was found inside apartment 5.

59. During the execution of Warrant No. 1, the Toshiba flat screen television with matching serial number 82698089C was found inside apartment 5. The television was located at the foot of the bed in the only bedroom, which was located in the rear of the apartment.

60. While Pile investigated the serial number on the television, McGuire, Tpr. Volk, and Sgt. Deluca noticed a green vegetable matter on the corner of the television stand. Specifically, the officers noticed what appeared to be the roach of a blunt, or marijuana rolled in a cigar wrapper. McGuire, having had prior training in drug detection, immediately recognized the vegetable matter as marijuana.

61. After conferring with each other, Pile, McGuire, Tpr. Volk, and Sgt. Deluca determined to secure another search warrant in order to expand their search of apartment 5. Their determination was based upon the fact that Warrant No. 1 only identified a search for the Toshiba television, and once the officers located the

television they could not continue their search inside apartment 5.

62. The officers decided to secure a second warrant in order to find the remote control for the Toshiba television. Furthermore, having found the green vegetable matter, it was decided by the officers that a more exhaustive search of apartment 5 could disclose additional drug violations.

63. McGuire left apartment 5 to prepare a second search warrant for the rest of apartment 5 while Pile remained alone inside apartment 5. Pile stated that he did not perform any search of apartment 5 until a second search warrant was secured by McGuire. (Suppression Hearing, February 22, 2005, p. 98).

64. McGuire returned to the Somerset Borough Police Station to prepare an Application for Search Warrant and Authorization at Warrant Control No. 100603–02 (hereinafter "Warrant No. 2"). While preparing the second search warrant, McGuire did not enter a new warrant control number on the prepared form previously saved on his computer as the Warrant No. 1 application. Consequently, even though McGuire updated the information regarding the second search warrant application, Warrant No. 2 was printed with Warrant Control No. 100603–01. When McGuire noticed his error, he crossed out "01" and handwrote "02" as it was the second warrant issued on October 6, 2003.

65. Included in the Application for Warrant No. 2 are the names of the possessors of the premises to be searched: "Kenrick PRIMO and Matt FLUGAN", both computer generated names. The following violations are also listed in the Application for Warrant No. 2: Title 35, Control Substance Act, subsection 113–unlawful activities and subsection A16–possession of a controlled substance; and Title 18, Section 3925(a), stolen property.

66. The Application for Warrant No. 2 also identifies the following items to be seized inside of apartment 5: "Cocaine, cocaine paraphernalia, evidence of illegal drug activity, *additional marijuana, marijuana paraphernalia, remote control for stolen Toshiba television (serial # 82698089), [and] additional stolen property*." (Application for Search Warrant and Authorization, Warrant Control No. 100603–02) (italicized items were handwritten). The handwritten text was included by Tpr. Volk, who assisted McGuire in preparing the application for Warrant No. 2.

67. Included in the Affidavit for Warrant No. 2 was the probable cause belief that the remote control for the stolen Toshiba flat screen television, serial number 82698089[C], would be located in apartment 5, 627 North Center Avenue, Somerset, Pennsylvania. Furthermore, McGuire established in the Affidavit that evidence of illegal drug activity would be located inside apartment 5 based upon the following facts:

a. McGuire is a trained and experienced police officer employed by Somerset Borough Police for approximately ten years, and during that time, McGuire was involved in over 100 stolen property investigations.

b. While executing Warrant No. 1, officers located the stolen Toshiba television, serial number 82698089C, reported stolen by Taylor. However, officers were unable to locate the remote control to the Toshiba television.

c. While executing Warrant No. 1, officers observed in plain view a marijuana cigarette on the table where the Toshiba

television was located.[1]

d. Five independent individuals corroborated information regarding the sale of large amounts of cocaine out of 627 North Center Avenue, Somerset, Pennsylvania. Furthermore, the individuals confirmed that two black related males from New York were selling large amounts of cocaine out of the 627 North Center Avenue residence. Both Sherman and Primo have been identified as black males from New York, and Sherman already indicated to Somerset Borough Police Officers that Primo was his brother.

e. On October 1, 2003, McGuire set up surveillance of 627 North Center Avenue, Somerset, Pennsylvania, and McGuire observed a heavy amount of pedestrian traffic going to and coming from 627 North Center Avenue, Somerset, Pennsylvania. Through his years of investigative experience, McGuire recognized this type of pedestrian traffic to be consistent with illegal drug activity.

f. On October 6, 2003, McGuire contacted the landlord of 627 North Center Avenue, Somerset, Pennsylvania, and the landlord confirmed that Primo rented apartment 5, 627 North Center Avenue, Somerset, Pennsylvania.

68. Assistant District Attorney Kathy Primavera read and approved the Application for Search Warrant and Authorization at Warrant Control No. 100603–02. The Affidavit is expressly incorporated by reference on the face of Warrant No. 2. Furthermore, upon reviewing the Application and Affidavit for Warrant No. 2, as well as McGuire's signature affirming that "there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure", and that such evidence is located at apartment 5, 627 North Center Avenue, Somerset, Pennsylvania, District Justice Cook signed and approved the application for the search warrant at 10:45 p.m. on October 6, 2003.

69. McGuire returned to 627 North Center Avenue at approximately 11:00 p.m. on October 6, 2003. (Suppression Hearing, February 22, 2005, p. 26).

70. Pile waited inside apartment 5 for McGuire to return with a properly secured search warrant for the rest of apartment 5. Upon McGuire's return, Pile verified that no one had entered apartment 5. Pile then conducted the search of apartment 5.

71. McGuire did not participate in the execution of Warrant No. 2. Rather, he was summoned by other officers to apartment 2 in order to interview two informants who were accompanying Primo when he came back to the residence.

72. Pile completed the bulk of the execution of Warrant No. 2 inside apartment 5.

73. While executing Warrant No. 2, Pile found a black satchel secreted away in a cubby-hole located in the bedroom closet. Inside of the satchel was a large quantity of suspected crack cocaine, as well as packaging materials.

74. Pile also found a small plastic bag inside a night-stand beside the bed which was consistent with those bags found inside the satchel. In the same area, a telephone bill was found for Primo's cell phone number. The bill, which listed numerous calls to various locations in New York and Guyana, was found along with a

---

**1.** The Court observes that although McGuire failed to include in the Affidavit for Warrant No. 1 the cocaine found inside apartment 2, McGuire does include in the Affidavit for Warrant No. 2 the cocaine seized from Sherman inside apartment 2. (Affidavit of Probable Cause, Warrant No. 2).

Rent–A–Center rental agreement for rented furniture, signed by Primo and Flugan.

75. Inside the telephone bill, officers also discovered an international drivers' license in the name of Shawn Parkinson, 375 East 51st Street, P.VT, Brooklyn, NY, 11203, place of birth Guyana, DOB 11/05/72, with a photograph of Kenrick/Theodore Primo on it.

76. As officers continued to search inside apartment 5, Sgt. Deluca spoke with Pile and asked if a silver key was found in the night-stand compartment. Pile informed Sgt. Deluca that they did find such a key with a Wal Mart brand. Sgt. Deluca informed Pile that McGuire spoke with a confidential informant inside apartment 2 who stated that Primo kept such a key in apartment 5 for a residence located on West Patriot Street.

77. Sgt. Deluca took the silver Wal Mart brand key to show the informant. The informant confirmed that it was the same key used previously to gain access into the residence on West Patriot Street.

78. All items seized during the execution of Warrant No. 2 were inventoried by Pile, witnessed by Tpr. Volk, and packaged into evidence bags.

79. Pile completed the initial inventory sheets for both Warrant Nos. 1 and 2. These initial sheets listed items 1 through 9 as follows: (1) One Toshiba TV Model No. MW24FM1, Serial No. 82698089C; (2) One Black bag containing suspected cocaine, baggies, scale with residue, vial with yellow liquid; (3) One baggie with suspected marijuana stems; (4) One rental agreement for Matt Flugan, Kenrick Primo; (5) Newport cigarette pack with plastic bag-gie, green vegetable matter suspected marijuana; (6) Two baggies with taped wrappers with white trace evidence; (7) One Check No. 1329, Route No. 31, Board & Ski (blank); (8) One Blackwoods Cigars with plastic baggie, green vegetable matter; and (9) Phone bill, Kenrick Primo. All items were seized and reported by Pile except for item number 6, which was reported by Tpr. Volk.

80. The initial inventory sheets did not include the silver key found in apartment 5, as the key was used to gain access to the resident on West Patriot Street prior to being logged onto the master copy of the inventory sheet.

81. The initial inventory sheets also did not include the green vegetable matter located beside the Toshiba television because it had already been placed into an evidence envelope. When McGuire left to secure an additional search warrant, Pile recollected that McGuire had taken this evidence with him to the Somerset Borough Police Station.[2] (Suppression Hearing, February 22, 2005, pp. 94–95).

82. Pile also prepared the revised inventory sheets and the Departmental Evidence Receipt forms for both Warrant Nos. 1 and 2.

83. When Pile prepared the Departmental Evidence Receipt forms, Pile did not fill in the police incident number and the warrant control numbers on the Department Evidence Receipt forms. Rather, McGuire completed the sections marked "Warrant Control No." for the inventory sheets in both Warrant No. 1 and Warrant No. 2.

---

2. It is unclear through the testimony of Officers Pile and McGuire whether McGuire erroneously took the green vegetable matter with him prior to securing the second search warrant or the third search warrant. Nevertheless, the Court determines that McGuire properly secured a second search warrant and included in the Affidavit of Probable Cause for Warrant No. 2 the seizure of the marijuana cigarette discovered on the table next to the Toshiba television.

84. McGuire erroneously identified both Department Evidence Receipt forms for Warrant Nos. 1 and 2 under the same warrant control number, i.e., 1006[0]3–02.

85. McGuire testified that the misidentification of the Department Evidence Receipt form for Warrant No. 1 was the consequence of both Department Evidence Receipt forms being completed at the same time. (Suppression Hearing, February 22, 2005, p. 28.)

86. Both inventory sheets were completed after the execution of Warrant No. 2, and they are identical inventory sheets.

87. When Pile prepared the Department Evidence Receipt forms for Warrant Nos. 1 and 2, he realized that he had "inadvertently forgot" to put the silver key (later identified as item number 10) and the green vegetable matter (item number 11) on the initial inventory sheets. (Suppression Hearing, February 22, 2005, p. 95).

88. Pile realized his error the very next day, October 7, 2003, as he prepared the Department Evidence Receipt forms for Warrant Nos. 1 and 2. Consequently, Pile advised McGuire to contact Somerset County Assistant District Attorney, Jerry Spangler, in order to determine what should be done to correct the omission. (Suppression Hearing, February 22, 2005, p. 95). McGuire was advised to contact Primo's counsel and to prepare a letter indicating the omission of items 10 and 11 from the initial receipt of inventory. McGuire subsequently prepared and mailed a letter to Primo's counsel which identified the omission of the silver key and the green vegetable matter.

89. With information provided by confidential informants to Somerset Borough police officers regarding the silver Wal Mart key and the green vegetable matter, McGuire prepared a third search warrant for the residence on West Patriot Street, Somerset, Pennsylvania.

90. This Application for Search Warrant No. 3 and Authorization was designated with Warrant Control Number 100703–01 (hereinafter "Warrant No. 3"), as it was the first warrant issued on October 7, 2003.

91. Included in the Application for Warrant No. 3 is the possessor of the premises to be searched, identified as "Primo KENRICK".

92. Also included in the Application for Warrant No. 3 was the following violation: Title 35, Control Substance Act, subsection 113–unlawful activities and subsection A16–possession of a controlled substance.

93. Included in the Affidavit for Warrant No. 3 was the probable cause belief that evidence of illegal drug activity, including cocaine and U.S. Currency, would be located at a two story residence known as 364 West Patriot Street, Somerset, Pennsylvania. This probable cause belief that illegal drug activity would be located at 364 West Patriot Street was based upon evidence seized from apartment nos. 2 and 5, 627 North Center Avenue, Somerset, Pennsylvania, and upon the following facts included in the affidavit prepared by McGuire:

a. McGuire is a trained and experienced police officer employed by Somerset Borough Police for approximately ten years, and during that time, McGuire was involved in over 100 stolen property investigations.

b. Primo was further identified by additional independent confidential informants as "Magic", a black male from New York who sells large amounts of cocaine from two separate residences: 627 North Center Avenue, Somerset, Pennsylvania and 364 West Patriot Street, Somerset, Pennsylvania. The informants also stated

that Magic had a safe, where he stored money and/or additional cocaine, inside a closet on the second floor of the residence known as 364 West Patriot Street, Somerset, Pennsylvania.

c. During a search on October 6, 2003 of the residence known as apartment 5, 627 North Center Avenue, Somerset, Pennsylvania, officers found a key for a residential lock. A confidential informant stated that the key opened the rear door of the residence known as 364 West Patriot Street, Somerset, Pennsylvania. The same confidential informant identified the residence known as 364 West Patriot Street, Somerset, Pennsylvania as a residence where the informant had previously been with Primo.

d. McGuire also requested a nighttime search based upon the alleged presence of cocaine inside the residence of 364 West Patriot Street, Somerset, Pennsylvania. A highly addictive and dangerous drug, cocaine needed to be immediately removed from the residence in order to prevent possible overdose death(s) and/or addiction to cocaine. Furthermore, even though Primo has been arrested, McGuire feared that the risk that other individuals might remove or steal the cocaine from the residence was very high.

94. Somerset County Assistant District Attorney David Geary approved Warrant No. 3, and District Justice Cook signed Warrant No. 3 on October 7, 2003 at 1:40 a.m.[3] The Affidavit is expressly incorporated by reference on the face of Warrant No. 3.

95. Prior to executing the search at 364 West Patriot Street on October 7, 2003, McGuire and other officers held a meeting regarding the responsibility of each officer during the execution of Warrant No. 3. The officers also reviewed the layout of the residence based upon descriptions offered by confidential informants.

96. Officers then proceeded to 364 West Patriot Street and conducted the search at approximately 2:20 a.m. on October 7, 2003. (Suppression Hearing, February 22, 2005, p. 33). Although the Receipt/Inventory of Seized Property for Warrant No. 3, which was prepared by McGuire, indicates that the search was conducted at 1:20 a.m., McGuire testified at the Suppression Hearing that the search was executed closer to 2:20 a.m. and that the error on the inventory sheet was the result of glancing at his watch the wrong way. (Suppression Hearing, February 22, 2005, pp. 33–34).

97. McGuire stated that prior to any search of the residence at 364 West Patriot Street, McGuire secured an approved and authorized search warrant. *Id.* at p. 34.

98. The initial entry team of officers who executed Warrant No. 3 included McGuire, Sgt. Deluca, Tpr. Volk, Pile, and Harbart. These officers executing Warrant No. 3 learned that 364 West Patriot Street was occupied by Diane Riggleman and her boyfriend, Rodney Myers. *Id.* at p. 78. Officers also learned that throughout the months of May 2003 through June 2003, Primo rented a bedroom in Ms. Riggleman's home.

99. Primo rented one bedroom at 364 West Patriot Street for $150.00 per week, or $600.00 per month. These payments were made on a weekly basis. *Id.* at p. 79.

---

**3.** The Court observes that McGuire was scheduled to work on October 6, 2003 from 2:00 p.m. to 10:00 p.m.; however, due to circumstances involving the preparation and execution of Warrant Nos. 1 and 2, McGuire continued to work through to October 7, 2003 at least three hours beyond his scheduled shift. (Suppression Hearing, February 22, 2005, p. 30).

100. According to Ms. Riggleman, Primo continued to pay her on a weekly basis for approximately six weeks, until he moved out at the end of June 2003. *Id.* at p. 80.

101. Although Primo ceased paying weekly rent to Ms. Riggleman, and he no longer stayed in the bedroom at 364 West Patriot Street, Primo failed to return the key to the residence to Ms. Riggleman. Ms. Riggleman testified that she continued to ask Primo for the return of the house key. *Id.* at p. 80.

102. Although Primo moved out of Ms. Riggleman's residence, he left a few belongings behind in the room he had rented. For example, some of Primo's clothes and a safe remained inside the bedroom at the Riggleman residence.

103. On a couple of occasions, Primo visited the Riggleman residence and entered the bedroom where his safe remained.

104. Upon execution of Warrant No. 3, McGuire described the bedroom once inhabited by Primo as a storage area. Specifically, McGuire noted that there was a bed without linens, a dresser, and an object with a sheet covering it. *Id.* at p. 35.

105. Subsequent to the search of the Riggleman residence, McGuire prepared the Receipt/Inventory of Seized Property for Warrant No. 3. Pile witnessed the form to verify that there was a valid search warrant, that the search was conducted and that particular items were seized.

106. The inventory sheet prepared for Warrant No. 3 listed the following seized items: (1) Sentry Safe; (2) Wooden smoking device; (3) Ohaus scales, model LS2000; (4) Box of sandwich bags with corners cut out; (5) Mail addressed to Kenrick Primo; (6) Three Verizon phone bills for Rodney Myers; (7) Polaroid of Diane Rigglman; and (8) Hemostats. (Receipt/Inventory of Seized Property, Warrant Control Number: 100703–01).

107. McGuire testified that upon seizing the safe, officers determined not to search the safe until a fourth warrant could be secured. *Id.* at pp. 36–37. Specifically, Warrant No. 3 did not include the contents of the safe as items to be searched; therefore, McGuire prepared a fourth search warrant for the search of the safe between approximately 10:00 a.m. and 12:00 p.m. on October 7, 2003. (Suppression Hearing, February 22, 2005, p. 38).

108. The Application for Search Warrant and Authorization was designated with Warrant Control Number: 100703–02 (hereinafter "Warrant No. 4"), as it was the second warrant to be issued on October 7, 2003.

109. In the Application for Warrant No. 4, "Primo KENRICK" is identified as the occupant or possessor of the premises to be searched, and the specific premises to be searched is identified as "A Sentry Safe Serial Number AL 309297", which was located by this time in Somerset Borough Police custody. (Application for Search Warrant and Authorization, Warrant Control Number: 100703–02).

110. The items to be seized from the safe are the "Contents of a Sentry Safe Serial Number AL 309297, additional cocaine, additional marijuana, additional U.S. Currency". *Id.*

111. Included in the Affidavit for Warrant No. 4 was the probable cause belief that evidence of illegal drug activity, including cocaine and U.S. Currency, would be found inside a Sentry Safe Serial Number AL 309297, located in Somerset Borough Police custody, 340 West Union Street, Somerset, Pennsylvania. This probable cause belief was based upon evidence seized from the residence of 364 West Patriot Street, Somerset, Pennsylva-

nia, and upon the following facts included in the affidavit prepared by McGuire:

a. McGuire is a trained and experienced police officer employed by Somerset Borough Police for approximately ten years, and during that time, McGuire was involved in over 100 stolen property investigations and over 50 druglaw violations.

b. On October 6, 2003 during a search of the KENRICK residence known as apartment 5, 627 North Center Avenue, Somerset, Pennsylvania, I found a key for a residential lock. Confidential informant # 2 informed me that the key to the residential lock that I found was the key to the rear door of the residence known as 364 West Patriot Street, Somerset, Pennsylvania. Confidential informant # 2 further physically identified the residence known as 364 West Patriot Street, Somerset, Pennsylvania where they had previously been with KENRICK.

c. On October 7, 2003, a search warrant was executed at 364 West Patriot Street, Somerset, Pennsylvania. Based upon descriptions provided by informants, a safe would be located inside a bedroom at 364 West Patriot Street. As a result of that search, a sentry safe Serial # AL 309297 was seized from the second floor bedroom. The occupant of that residence, Ms. Riggleman, stated that the safe belonged to Primo KENRICK A.K.A. MAGIC. The occupant also advised that KENRICK brought the safe into the room and that she believed the safe to contain illegal drugs.

112. Although McGuire did not recall which Somerset County Assistant District Attorney approved Warrant No. 4, Warrant No. 4 was approved as evidenced by a handwritten "DA File No." notation on the application. (Suppression Hearing, February 22, 2005, p. 38). The Affidavit is expressly incorporated by reference on the face of Warrant No. 4.

113. McGuire proceeded to District Justice Cook's office, where District Justice Cook read the Application and Affidavit for Warrant No. 4. Determining that probable cause existed for the search of the safe located at 364 West Patriot Street, Somerset, Pennsylvania, District Justice Cook signed and approved the application for Warrant No. 4 at 12:20 p.m. on October 7, 2003.

114. McGuire participated in executing Warrant No. 4 on October 7, 2003 at approximately 1:30 p.m. (Suppression Hearing, February 22, 2005, p. 40).

115. The initial inventory sheet prepared for Warrant No. 4 listed the following seized items: (1) Baggie of green vegetable matter (suspected marijuana); (2) Jennings .25 caliber semi automatic serial number 024200 with a loaded clip; (3) Box of .25 automatic FMJ 50 gr cartridges containing 42 live cartridges; (4) Razor with black handle with white residue; (5) Plastic bags; and (6) $1,050.00 in U.S. Currency. (Receipt/Inventory of Seized Property; Suppression Hearing, February 22, 2005, pp. 40, 72).

116. McGuire's first inventory sheet for Warrant No. 4 failed to include item number 7, bag containing suspected cocaine. (Suppression Hearing, February 22, 2005, p. 61). McGuire explained that when officers opened the safe, pictures were taken of the contents inside the safe before these items were removed. *Id.* Then, items were removed from the safe and pictures were again taken of those items. McGuire then took the suspected cocaine and the baggie, weighed it, and placed it into the police evidence storage area as the other items were still being categorized. *Id.* Therefore, when the first inventory sheet was prepared, the suspected cocaine and the baggie were already locked away into evidence storage. *Id.*

117. Upon learning of this omission, McGuire added item number 7 to the Receipt/Inventory of Seized Property, and he notified Primo's counsel of the omission. *Id.* at 72. McGuire subsequently prepared and mailed a registered letter to Primo's counsel which identified the omission of item number 7.

118. Primo filed a Motion to Suppress Evidence and a Motion for View. (Document No. 21). Specifically, Primo alleges the following violations pursuant to the Fourth Amendment to the United States Constitution: (1) Officers conducted two warrantless searches during the second search of apartment 5 and during the search of the Riggleman residence; (2) Evidence obtained during the second search of apartment 5, during the search of the Riggleman residence, and during the search of the safe must be suppressed under the fruit of the poisonous tree doctrine. *Id.* Primo also alleges that the failure to issue separate inventory sheets for the searches executed pursuant to Warrant Nos. 1 and 2 violates Pennsylvania Rule of Criminal Procedure 209(A). *Id.* Furthermore, Primo states that defects exist in the warrants such that they lacked probable cause to support the subsequent searches executed by the officers. Finally, Primo requested a view of the scene where a vehicle stop resulted in additional charges against Primo for the alleged sale of drugs or the commission of a violent crime. *Id.*

119. In a Court Order, dated January 6, 2005, Primo's Motion for View was denied, and a hearing regarding the Motion to Suppress Evidence was held on Febru-

ary 22, 2005.[4] At the conclusion of the suppression hearing, the Government presented oral argument. Conversely, Primo filed a post-hearing brief addressing issues raised in his Motion to Suppress Evidence and the issue of Primo's standing to challenge the validity of Warrant Nos. 3 and 4.

## II. Conclusions of Law

### A. Probable Cause and Search Warrant Nos. 1 and 2

#### A.1. Standard of Review

■ 1. Initially, the Court observes that the "proponent of a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated." *United States v. Leveto,* 343 F.Supp.2d 434, 441 (W.D.Pa.2004) (citing to *United States v. Acosta,* 965 F.2d 1248, 1257 n. 9 (3d Cir.1992))(*Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

■ 2. The burden of proof in a suppression motion is a preponderance of evidence standard. *Leveto,* 343 F.Supp.2d at 441–42 (*citing United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

3. Weighing the evidence according to this standard, the trial judge at a suppression hearing reviews the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, de-

---

4. The Court observes that although it ruled upon Primo's Motion for View, the Government presented argument regarding whether Primo had standing to challenge a vehicle stop which led to the collection of evidence supporting additional charges against Primo. Primo, however, did not address the vehicle stop or the relevant Motion for View at the suppression hearing. The Court determines that where the Court has already entered an Order denying Primo's Motion for View, the Court will not re-examine Primo's Motion for View at this time.

ductions and conclusions to be drawn from the evidence". *Leveto*, 343 F.Supp.2d at 442 (*quoting United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir.1993)); *see also United States v. Matthews*, 32 F.3d 294, 298 (7th Cir.1994); *United States v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990); *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir.1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975).

4. The Fourth Amendment to the United States Constitution sets forth the right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV; *United States v. Santos*, 340 F.Supp.2d 527, 533 (D.N.J.2004).

5. Following a series of United States Supreme Court decisions which explored the scope and application of this Fourth Amendment right, the Supreme Court propounded that privacy rights were included in the previously established property rights jurisprudence of the Fourth Amendment. *See Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Conley*, 856 F.Supp. 1010, 1016–17 (W.D.Pa.1994). Specifically, Justice Harlan, in his concurring opinion in *Katz* declared, "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring) (quoted in *Conley*, 856 F.Supp. at 1017).

6. Consequently, Justice Harlan's "formulation of the 'reasonable expectation of privacy' test" is the standard consistently applied by the majority of the Supreme Court. *Conley*, 856 F.Supp. at 1017; *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989); *California v. Greenwood*, 486 U.S. 35, 39, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30 (1988); *Oliver v. United States*, 466 U.S. 170, 177, 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984); *Soldal v. Cook County, Ill.*, 506 U.S. 56, 62, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992); *United States v. Flores–Montano*, 541 U.S. 149, 124 S.Ct. 1582, 158 L.Ed.2d 311 (2004).

■ 7. In order to challenge the reasonableness of a search and seizure, the proponent must possess a "legitimate expectation of privacy".[5] *Conley*, 856 F.Supp. at 1015–16 (*quoting United States v. Felton*, 753 F.2d 256, 259 (3d Cir.1985)); *see Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

8. The United States Supreme Court has also adopted distinct parameters of what constitutes a "search" and what constitutes a "seizure". *Conley*, 856 F.Supp. at 1018. This distinction was recognized and enunciated in *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) when the Court stated the following:

> [The Fourth Amendment] protects two types of expectations, one involving 'searches,' the other 'seizures.' A 'search' occurs when an expectation of privacy that society is prepared to accept as reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an

5. The Court observes that the Defendant's Motion to Suppress Evidence and the Government's Response thereto raises the issue of the Defendant's legitimate expectation of privacy only with regard to Warrant Nos. 3 and 4. Therefore, the Court will address the Defendant's expectation of privacy regarding Warrant Nos. 3 and 4, *supra*.

individual's possessory interests in that property.

*Jacobsen,* 466 U.S. at 113, 104 S.Ct. at 1656 (quoted in *Conley,* 856 F.Supp. at 1018); *Soldal,* 506 U.S. 56, 113 S.Ct. at 544, 121 L.Ed.2d 450 (The Court held that the Fourth Amendment's prohibition against unreasonable "seizures" protects property interests.).

■ 9. In subsequent Supreme Court decisions, the Court further elaborated on the manner in which the Fourth Amendment protects both privacy and property interests. For example, the applicability of the exceptions to the warrant, probable cause, and particularity requirements distinguishes the Fourth Amendment protections against unlawful searches from those against unlawful seizures. *Conley,* 856 F.Supp. at 1018; see *Soldal,* 506 U.S. at 64–65, 113 S.Ct. at 545–546 (quoted in *Conley,* 856 F.Supp. at 1018–1019) ("Justice White explained the intimate relationship between the 'plain view' doctrine, which permits warrantless seizures, and the property interests protected by the Fourth Amendment").[6] (*Conley,* 856 F.Supp. at 1018).

---

**6.** In *Soldal,* Justice White stated the following:

> Suppose for example that police officers lawfully enter a house, by either complying with the requirement or satisfying one of its recognized exceptions—e.g., through a valid consent or a showing of exigent circumstances. If they come across some item in plain view and seize it, no invasion of personal privacy has occurred. *Horton [v. California],* 496 U.S. [128], at 133–34, 110 S.Ct. [2301], 2305–2306, [110 L.Ed.2d 112]; *[Texas v.] Brown,* 460 U.S. [730], at 739, 103 S.Ct. [1535], at 1541, [75 L.Ed.2d 502] (opinion of REHNQUIST, J.). If the boundaries of the Fourth Amendment were defined exclusively by rights of privacy, 'plain view' seizures would not implicate that constitutional provision at all. Yet, far from being automatically upheld, 'plain view' seizures have been scrupulously subjected to Fourth Amendment inquiry. Thus, in the absence of consent or a warrant permitting the seizure of the items in question, such seizures can by justified only if they meet the probable cause standard, *Arizona v. Hicks,* 480 U.S. 321, 326–327, 107 S.Ct. 1149, 1153–1154, 94 L.Ed.2d 347 (1987), and if they are unaccompanied by unlawful trespass. *Horton,* 496 U.S. at 136–137, 110 S.Ct. at 2307–2309. That is because the absence of a privacy interest notwithstanding, '[a] seizure of the article ... would obviously invade the owner's possessory interest.' *Id.* at 134, 110 S.Ct. at 2306; *see also Brown, supra,* 460 U.S. at 739, 103 S.Ct. at 1541 (opinion of REHNQUIST, J.). The plain view doctrine 'merely reflects an application of reasonableness to the law governing seizures of property,' *ibid.; Coolidge v. New Hampshire,* 403 U.S. 443, 468, 91 S.Ct. 2022, 2039, 29 L.Ed.2d 564 (1971); *id.* at 516, 91 S.Ct. at 2063 (White, J., concurring and dissenting).

*Soldal,* 506 U.S. at 64–65, 113 S.Ct. at 545–546 (quoted in *Conley,* 856 F.Supp. at 1018–1019). Further emphasizing the justifications of the plain view doctrine, the Supreme Court distinguished its application to privacy and property interests in *Horton,* 496 U.S. 128, 136–137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990)as follows:

> It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify warrantless seizure. First, not only must the item be in plain view; its incriminating character must also be 'immediately apparent.' ... Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.

*Horton,* 496 U.S. 128, 136–137, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990) (citations omitted) (quoted in *Conley,* 856 F.Supp. at 1019). Thus, in *Horton,* the Supreme Court analysis of the plain view doctrine concluded that the doctrine allows warrantless seizures, but the plain view doctrine "cannot overcome a reasonable expectation of privacy and justify an otherwise invalid warrantless search." *Conley,* 856 F.Supp. at 1019. Accordingly, the lawful issuance of a search warrant protects an individual's privacy interests *and*

10. As a consequence of the Supreme Court's pronounced distinctions, the current Fourth Amendment jurisprudence considers government conduct that may "violate the Fourth Amendment if it unreasonably invades one's reasonable expectations of privacy *or* one's ownership or possessory interests in certain property." *Conley*, 856 F.Supp. at 1019. (emphasis in original).

11. The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

■ 12. The Fourth Amendment prohibits the issuance of a general warrant. *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

■ 13. Accordingly, a search warrant may be issued only if there is probable cause to believe that evidence of criminal activity will be found on the premises or person to be searched. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.2d 543 (1925).

■ 14. To that end, a neutral and detached " magistrate must determine that there is a 'fair probability that ... evidence of a crime will be found in a *particular* place.'" *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)(quoted in *Leveto*, 343 F.Supp.2d at 442). (emphasis added).

■ 15. The particularity requirement of the Fourth Amendment provides that a search warrant must describe with particularity the place to be searched and the persons or things to be seized. *See* U.S. Const. Amend. IV; Fed.R.Crim.P;

property interests against unreasonable police intrusions. *See Steagald v. United States,* 451

*United States v. Williams*, 43 F.2d 184 (D.C.Pa.1930); *United States v. Gigli*, 573 F.Supp. 1408 (D.C.Pa.1983). The search warrant should describe the place to be searched and items to be seized with sufficient particularity so as to leave "nothing ... to the discretion of the officer executing the warrant." *Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 69 L.Ed. 757 (1925).

16. The magistrate's determination is based upon the requesting law enforcement officer's affidavit containing sufficient facts and circumstances permitting an independent finding of probable cause of evidence of a crime. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

17. The determination of probable cause is not a fixed, mechanical process. Rather, the Supreme Court held in *Gates* that probable cause is a " 'practical, non-technical conception' that may be formulated through common sense analysis rather than adherence to 'separate and independent requirements ... rigidly exacted in every case.'" *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328 (quoted in *Lesoine v. County of Lackawanna*, 2000 WL 572466, *4 (M.D.Pa.2000)). In other words, when a magistrate considers a request for a search warrant, the magistrate "must make a 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him[/her] ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Id.* at 235, 103 S.Ct. at 2330, (quoted in *Lesoine*, 2000 WL at *4).

18. The magistrate's evaluation is often referred to as the "totality-of-the-circumstances approach". *United States v. Daly,*

U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38(1981). (emphasis added).

937 F.Supp. 401, 407 (E.D.Pa.1996); *see Gates,* 462 U.S. 213, 238, 103 S.Ct. 2332.

19. When adjudicating motions to suppress evidence for lack of probable cause, a district court reviewing the magistrate's evaluation exercises a deferential review of the initial probable cause determination made by the magistrate. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *see U.S. v. Conley,* 4 F.3d 1200, 1205 (3d Cir.1993).

20. The Supreme Court stated in *Conley* that the following standard applies with regard to courts reviewing a motion to suppress evidence for lack of probable cause:

> [T]he district court [may] exercise only a deferential review of the initial probable cause determination by the magistrate. A magistrate's determination of probable cause should be paid great deference by reviewing courts. The duty of the reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a fair probability that contraband or evidence of a crime will be found in a particular place, a reviewing court is to uphold the warrant as long as there is substantial basis for a fair probability that evidence will be found.

*Conley,* 4 F.3d at 1205 (*citing Gates,* 462 U.S. at 236–238, 103 S.Ct. at 2330–2331) (internal quotations omitted) (quoted in *Daly,* 937 F.Supp. at 408).

21. The Supreme Court further noted in *Conley* that "a reviewing court may not conduct a *de novo* review of a probable cause determination. Even if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate's determination was made consistent with the minimal substantial basis standard." *Conley,* 4 F.3d at 1205 (*citing Gates,* 462 U.S. at 236, 103 S.Ct. at 2331)(quoted in *Daly,* 937 F.Supp. at 408).

22. Third Circuit precedent also provides that "direct evidence linking the residence to criminal activity is not required to establish probable cause." *United States v. Burton,* 288 F.3d 91, 103 (3d Cir.2002) (*citing United States v. Hodge,* 246 F.3d 301, 305 (3d Cir.2001); *United States v. Whitner,* 219 F.3d 289, 297 (3d Cir.2000); *United States v. Conley,* 4 F.3d 1200, 1207 (3d Cir.1993); *United States v. Jones,* 994 F.2d 1051, 1056 (3d Cir.1993)).

23. Although it would be ideal if "every affidavit would contain direct evidence linking the place to be searched to the crime, it is well established that direct evidence is not required for the issuance of a search warrant." *Jones,* 994 F.2d at 1056 (quoted in *Burton,* 288 F.3d at 103). Indeed, "probable cause to search can be based on an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested." *Burton,* 288 F.3d at 103. Accordingly, probable cause "can be, and often is, inferred by 'considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide stolen property.'" *Burton,* 288 F.3d at 103 (*quoting United States v. Jackson,* 756 F.2d 703, 705 (9th Cir.1985)).

24. Nevertheless, evidence seized in violation of the Fourth Amendment will be suppressed as "fruits of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)(quoted in *Leveto,* 343 F.Supp.2d at 442).

## A.2.  Search Warrant No. 1

25.  Considering the privacy and property interests protected by the Fourth Amendment, the narrow standard of this reviewing Court, and Third Circuit precedent, the Court is convinced that the evidence contained in the McGuire affidavit for Warrant No. 1 is sufficient to establish probable cause to search apartment 5, 627 North Center Avenue, Somerset, Pennsylvania.

26.  With regard to the stolen Toshiba television, the Court determines that sufficient evidence was provided in the McGuire affidavit to establish the fair probability that evidence of a crime would be located inside apartment 5. Specifically, McGuire is an experienced police officer employed by the Somerset Borough Police Department. Additionally, the statements of Taylor, the Rent–A–Center manager, and Sherman, both indicated that the television was located at apartment 5, 627 North Center Avenue, Somerset, Pennsylvania. More specifically, Taylor received information that Flugan stole the television, and Taylor stated to McGuire that Flugan resided in apartment 5, 627 North Center Avenue, Somerset, Pennsylvania with Primo. Also, Sherman directed officers to apartment 5, 627 North Center Avenue where he recalled seeing the Toshiba television. Furthermore, Sherman stated to McGuire that Primo resided inside apartment 5. The totality of these circumstances clearly establish a substantial basis for a reasonable probability that evidence of stolen property would be located inside apartment 5, 627 North Center Avenue.

27.  Similarly, with regard to the inclusion of drug violations in the Application for Warrant No. 1, the Court determines that a substantial basis was provided in the McGuire affidavit to establish a reasonable probability that evidence of a drug violation would be located inside apartment 5. In particular, Sherman was found inside apartment 2, 627 North Center Avenue, Somerset, Pennsylvania with a significant amount of cocaine in his possession. Furthermore, five independent individuals corroborated information regarding the sale of large amounts of cocaine out of 627 North Center Avenue, Somerset, Pennsylvania. These sales were allegedly conducted by two black related males from New York. Sherman already identified himself as Primo's brother. Additionally, McGuire observed during surveillance of 627 North Center Avenue, Somerset, Pennsylvania, a heavy amount of pedestrian traffic going to and coming from 627 North Center Avenue that is consistent with illegal drug activity. Consequently, the Court determines that the totality of these circumstances establish a substantial basis for a reasonable probability that evidence of illegal drug activity would be located inside apartment 5, 627 North Center Avenue.

28.  Accordingly, the Court determines that there was no defect in Warrant No. 1, and that Somerset Borough police officer McGuire submitted an affidavit containing sufficient facts and circumstances such that District Justice Cook made an independent finding of probable cause of evidence of a crime at apartment 5, 627 North Center Avenue, Somerset, Pennsylvania.

## A.3.  Search Warrant No. 2.

29.  Initially, Primo argues that evidence obtained from apartment 5, 627 North Center Avenue, Somerset, Pennsylvania, which resulted in charges against Primo for unlawful delivery under Pennsylvania's Controlled Substances Act, was actually the product of an illegal search conducted pursuant to "search warrant # 1000603–01". (Document No. 21, p. 8).

Specifically, Primo contends that a thorough search of apartment 5 was conducted by officers prior to McGuire securing a second search warrant. *Id.* at pp. 8–10. Thus, any evidence obtained during this search should be suppressed as fruit of the poisonous tree. *Id.*

30. Primo also argues that Somerset Borough police officers lacked probable cause to perform an exhaustive search of apartment 5 because the green vegetable matter was omitted from the initial inventory sheets prepared by Pile. Consequently, Primo states that this omission of the green vegetable matter from the Receipt/Inventory sheets resulted in a lack of the probable cause necessary to support an application for a second search warrant.[7] *Id.;* Document No. 30, p. 5.

31. Based upon the findings of fact above, the privacy and property interests protected by the Fourth Amendment, an exception to those standards as established by the plain view doctrine, and the narrow standard of this reviewing Court, the Court is convinced that the evidence contained in the McGuire affidavit for Warrant No. 2 provided District Justice Cook a substantial basis to conclude that a reasonable probability existed that evidence of illegal drug activity would be located inside apartment 5, 627 North Center Avenue, Somerset, Pennsylvania. Specifically, the arrest and subsequent seizure of crack cocaine and United States currency from Sherman, a known relative of Primo, supported McGuire's belief that additional drug violations would be found in apartment 5, 627 North Center Avenue. Furthermore, pursuant to the execution of Warrant No. 1, once inside apartment 5, McGuire observed a green vegetable material next to a stolen television, and based upon his years of experience and training, McGuire determined that the green vegetable matter was marijuana. McGuire also stated in the affidavit for Warrant No. 2 that based upon the surveillance of 627 North Center Avenue, Somerset, Pennsylvania, pedestrian traffic consistent with drug activity was observed at that location. Accordingly, this Court finds that District Justice Cook had a substantial basis for determining probable cause existed in order to issue Warrant No. 2.

32. The Court also determines that Primo's assertion that Somerset Borough police officers, namely Pile, conducted a search of apartment 5 while McGuire went to secure a second search warrant is without support. *See* Document Nos. 21 and 30. Specifically, in his Motion to Suppress Evidence and in Defendant's Post–Hearing Brief In Support of Motion to Suppress Evidence, Primo requests this Court to infer that officers conducted an illegal search of apartment 5. *Id.* However, the Court determines that based upon the finding of facts above, and based upon a review of the testimony provided by

---

**7.** The Court observes that the Fourth Amendment particularity requirement was not addressed by Primo during the Suppression Hearing on February 22, 2005, nor was the particularity requirement raised as a basis for suppression of evidence in Primo's Post–Hearing Brief in Support of Motion to Suppress Evidence (Document No. 30). However, the Court observes that the phrase "additional stolen property" in the Application for Warrant No. 2 does not describe with sufficient particularity the items to be seized during the execution of the second search warrant, a defect which the Government has conceded. (Document No. 24, p. 18). Nevertheless, the other items to be seized pursuant to Warrant No. 2 were described with sufficient particularity, and the Court determines that the overly-broad portion of the Application for Warrant No. 2 does not invalidate nor warrant the suppression of particularly described items included in Warrant No. 2. *Id.* at pp. 18–19; *see United States v. Christine,* 687 F.2d 749, 754–59 (3d Cir. 1982).

McGuire and Pile during the suppression hearing, the "credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence", *Leveto*, 343 F.Supp.2d at 442 (*quoting United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir.1993)), weigh in favor of McGuire and Pile's recounting of events. Accordingly, the Court determines that the evidence seized during the execution of Warrant No. 2 shall not be suppressed as fruit of the poisonous tree, and Primo's Motion to Suppress Evidence based upon lack of probable cause in Warrant Nos. 1 and 2 is denied.

## B. Reasonable Expectation of Privacy to Challenge Search Warrant Nos. 3 and 4.

### B.1. Standard of Review

33. Primo argues in his Motion to Suppress Evidence (Document No. 21) and in his Post–Hearing Brief in Support of Motion to Suppress Evidence (Document No. 30), that all items seized pursuant to Warrant No. 3 should be suppressed as the warrant was not supported by probable cause.

34. Conversely, the Government asserts as a threshold matter that Primo lacks a reasonable expectation of privacy in the residence located at 364 West Patriot Street, Somerset, Pennsylvania, and Primo lacks a reasonable expectation of privacy in the safe located in the bedroom he once rented at 364 West Patriot Street. (Document No. 24, pp. 20–28). Accordingly, the Government asserts that Primo has no legitimate expectation of privacy in either circumstance to challenge the issuance of Warrant Nos. 3 and 4.

35. Initially, the Court observes that Primo bears the burden to establish his expectation of privacy in the bedroom searched at 364 West Patriot Street, and

in the contents of the safe found inside the bedroom. *United States v. Perez*, 280 F.3d 318, 338 (3d Cir.2002). If Primo fails to establish a "legitimate expectation of privacy" in the areas searched with regard to Warrant Nos 3 and 4, then Primo is foreclosed from asserting a challenge that these warrants were executed illegally by Somerset Borough police officers. *United States v. Felton*, 753 F.2d 256, 259 (3d Cir.1985) (*quoting Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980)) (cited in *Conley*, 856 F.Supp. at 1015–1016); *see Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

36. With regard to Primo's expectation of privacy in the bedroom located at 364 West Patriot Street, Somerset, Pennsylvania, and in the safe located inside the bedroom, the "reasonable expectation of privacy" test formulated by Justice Harlan in *Katz* instructs that the threshold inquiry is twofold: whether Primo exhibited an actual (subjective) expectation of privacy in the bedroom, and whether that expectation is one that society is prepared to recognize as reasonable. *Katz*, 389 U.S. at 361, 88 S.Ct. at 516 (quoted in *Conley*, 856 F.Supp. at 1017); *see Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. The Court also recognizes that the "Fourth Amendment's protective umbrella, as interpreted by *Katz*, shields only those expectations of privacy which are 'justifiable' " (*U.S. v. Santillo*, 507 F.2d 629, 631 (3d Cir.1975)), and these expectations are measured by an objective privacy standard. *Id; see also Katz*, 389 U.S. at 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (concurring opinion of Harlan, J.).

### B.2. Search Warrant No. 3

37. The Court determines that based upon the above findings of fact, Primo did not establish a legitimate expectation of privacy in the bedroom at 364 West

Patriot Street, Somerset, Pennsylvania.[8] Specifically, the Court observes that during the months of May 2003 and June 2003, Primo may have demonstrated a legitimate expectation of privacy in the bedroom he rented for a brief period of time from Ms. Riggleman; however, based upon the factual circumstances after Primo moved out of the bedroom, Primo has not demonstrated a legitimate expectation of privacy in the bedroom located at 364 West Patriot Street, Somerset, Pennsylvania on the date of the search (October 7, 2003) conducted by Somerset Borough police officers.

38. The Court observes that the Applications for Warrant Nos. 3 and 4 list the owner of the premises as "Primo KENRICK"; however, the Court notes that McGuire was unaware at the time he prepared the Applications for Warrant Nos. 3 and 4 that Primo no longer rented a bedroom from Ms. Riggleman, the occupant at 364 West Patriot Street.

39. The Court also observes that Primo continued to possess a key to the residence of 364 West Patriot Street despite Ms. Riggleman's efforts to have the key returned to her. The key unlocked the back door to the residence at 364 West Patriot Street, which included three separate bedrooms, one of which had been rented by Primo for approximately six weeks, during the period of May 2003 through June 2003. However, the bedroom rented by Primo did not have a separate lock on its door. Indeed, Ms. Riggleman could have entered the bedroom once rented by Primo at any-

time without having to unlock the entrance door. Furthermore, the door to the bedroom once rented by Primo was not even attached to the hinges. Specifically, the door to the bedroom had to be "manually lift[ed] and put on". (Suppression Hearing, February 22, 2005, p. 84).

40. The Court further notes that the few personal items left in the bedroom for approximately four months after the date of Primo's last rent payment do not permit the objective inference that Primo intended to return and claim a reasonable expectation of privacy over those personal items. Rather, the Court is inclined to permit an opposite inference such that the voluntarily discarded personal items support the conclusion that Primo had relinquished a reasonable expectation of privacy in the property well before the date of the search. Indeed, Ms. Riggleman testified that she requested on several occasions that Primo remove these personal items from the residence. (Suppression Hearing, February 22, 2005, p. 87). However, Primo never complied with Ms. Riggleman's request, supporting the inference that Primo willingly gave up a claim to these items.

41. Accordingly, by review of objective evidence, the Court concludes that it is not reasonable to conclude that Primo had an actual (subjective) expectation of privacy to the residence of 364 West Patriot Street; nor does it appear reasonable that Primo had a legitimate expectation of privacy to a bedroom for which he no longer paid rent, which had no separate lock, and

8. The Court notes that an essential predicate to any search inside the residence of 364 West Patriot Street is the valid issuance and execution of a search warrant signed by a neutral and detached magistrate. *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Accordingly, the Court addresses Primo's claim that Warrant No. 3 is not supported by requisite probable cause in section C.1., *supra;* however, while addressing the Government's claim that Primo lacks legitimate expectations of privacy in order to challenge Warrant Nos. 3 and 4, the Court presupposes that the officers did not violate the Fourth Amendment, and they arrived at the residence at 364 West Patriot Street with valid search warrants.

which appeared to be used by the occupant (Ms. Riggleman) to store a few boxes.

### B.3. Search Warrant No. 4

■ 42. With regard to Primo's expectation of privacy in the safe located inside the bedroom at 364 West Patriot Street, Somerset, Pennsylvania, the Court determines that based upon the findings of fact above, Primo did establish a legitimate expectation of privacy in the contents of the safe located inside the bedroom at 364 West Patriot Street, Somerset, Pennsylvania.

43. The need for Somerset Borough police officers to obtain Warrant No. 4 in order to examine the contents of the safe arose from Primo's legitimate expectation of privacy that society would embrace as reasonable. *Katz,* 389 U.S. at 353, 88 S.Ct. 507; *Jacobsen,* 466 U.S. at 113, 104 S.Ct. 1652, *Conley,* 856 F.Supp. at 1020–1021 ("[C]ompartments are containers that do not reveal to plain view their contents .... Society accepts as reasonable expectations of privacy in such containers, even when

the containers themselves are in plain view in public.").

44. The internal compartment of the seized safe was an area in which Primo exercised "dominion and control". *Conley,* 856 F.Supp. at 1020.

45. Primo's control of the contents of the safe is evidenced by the locked nature of the safe when seized by Somerset Borough police officers. *See* Suppression Hearing, February 22, 2005, p. 61. Primo retained a legitimate expectation of privacy in the contents of the safe as he possessed the only combination/key to open the safe, supporting the objective inference that Primo had the right of exclusion as to the public and government in the contents of the safe.[9] *See Conley,* 856 F.Supp. at 1020; *United States v. Acosta,* 965 F.2d 1248, 1256–1257 (3d Cir.1992) (property interests are still relevant to privacy interests). Furthermore, the inference that Primo attempted to exclude the safe from public view is supported by the factual circumstances that Ms. Riggleman never even noticed the safe inside the bedroom of the residence at 364 West Patriot Street

9. The Court observes that in its oral argument to the Court at the conclusion of the Suppression Hearing on February 22, 2005 (p. 124–125), the Government raised the issue of whether a legitimate expectation of privacy exists regarding the bedroom once rented by Primo because it was used primarily as a place to "stash" drugs and money, the fruits of drug related activity. Citing to *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998); *United States v. Perez,* 280 F.3d 318, 337 (3d Cir.2002). Having already disposed of the issue regarding Primo's expectation of privacy in the bedroom located at 364 West Patriot Street, the Court turns to a brief analysis of Primo's expectation of privacy in the contents of the safe as they are allegedly related to criminal activities.

Citing the analysis in *Conley,* 856 F.Supp. at 1021–1022, the Court determines that based upon the factual circumstances presented in the case *sub judice,* an argument that

there "can be no expectation of privacy for instrumentalities [of a crime][*see United States v. Jacobsen,* 466 U.S. 109, 123, 104 S.Ct. 1652, 1661, 80 L.Ed.2d 85 (1984)] would be inconsistent with the longstanding warrant requirement for closed containers, [citation omitted], with respect to fruits, instrumentalities, contraband, and perhaps, mere evidence. Probable cause to seize a container believed to contain contraband, for instance, would establish probable cause to believe that the container concealing the contraband was an instrumentality of the offense." *Conley,* 856 F.Supp. at 1021. Specifically, the invasion of the safe appraised on the basis of the facts as they existed on October 7, 2003, reveal that the nature and operation of the safe did not demonstrate a *per se* illegality at the time it was seized. Consequently, any governmental conduct at the time could not reveal whether contraband was located inside the safe without invading Primo's private possessory interest in the contents of the safe.

(Suppression Hearing, February 22, 2005, p. 85), and Pile stated that a sheet covered the appearance of the safe inside the bedroom once rented by Primo. *Id.* at 103.

46. Primo's control of the contents of the safe is also supported by the testimony of McGuire during the Suppression Hearing that in order to access the safe seized by Somerset Borough police officers from the residence of 364 West Patriot Street, Somerset, Pennsylvania, a locksmith was summoned in order to open the safe and conduct a search of the contents inside the safe. (Suppression Hearing, February 22, 2005, p. 61).

47. Accordingly, by review of objective evidence, the Court concludes that it is reasonable to conclude that Primo had an actual (subjective) expectation of privacy to the safe located in the bedroom at the residence of 364 West Patriot Street; furthermore, it is reasonable that a meaningful interference of Primo's possessory interest in that safe occurred when the contents of the safe were seized by Somerset Borough police officers on October 7, 2003. Thus, Primo has established a threshold legitimate expectation of privacy to the safe located inside the bedroom at 364 West Patriot Street in order to challenge the issuance of Warrant No. 4.

## C. Probable Cause and Search Warrant Nos. 3 and 4.

48. Initially, the Court observes that although it has determined that Primo did not have a legitimate expectation of privacy in the previously rented bedroom, located at 364 West Patriot Street, Somerset, Pennsylvania, in the interests of clarity and caution, the Court examines whether District Justice Cook had a substantial basis for determining that probable cause existed not only for the issuance of Warrant No. 4, but also Warrant No. 3.

49. Without recounting each specific factual detail already mentioned above, the Court notes that in the Application for Warrant No. 3, McGuire set forth a substantial basis for determination that probable cause existed for the issuance of Warrant No. 3. Specifically, the affidavit prepared by McGuire set forth a substantial basis for the conclusion that evidence of violations of the 35 Pa.C.S.A. § 780–113A16 existed at 364 West Patriot Street, Somerset, Pennsylvania. For example, McGuire established that independent confidential informants described 364 West Patriot Street as the location where Primo stored the crack cocaine he sold and the money Primo used to further such illegal activities. Furthermore, informants described in detail the silver key used to access the residence at 364 West Patriot Street, and informants even noted which door the key opened. Moreover, one informant visited this particular residence with Primo, describing for officers in detail the interior of the home. Indeed, such description aided officers as they prepared to enter the residence during the early morning hours of October 7, 2003.

50. Accordingly, the Court determines that there was a substantial basis for a reasonable probability that evidence of illegal drug activity would be found at 364 West Patriot Street, Somerset, Pennsylvania on October 7, 2003.

51. The Court further concludes that in the Application for Warrant No. 4, McGuire set forth a substantial basis for determination that probable cause existed for the issuance of Warrant No. 4. Specifically, McGuire listed the fruits of the prior searches conducted on October 6, 2003 and October 7, 2003. Additionally, McGuire set forth the corroborating information supplied by independent confidential informants regarding the description of another

location where Primo stored crack cocaine and United States currency.

52. Accordingly, the Court determines that there was a substantial basis for a reasonable probability that evidence of illegal drug activity would be found inside the Sentry Safe discovered in the bedroom once rented by Primo at 364 West Patriot Street, Somerset, Pennsylvania, and, accordingly, Primo's Motion to Suppress Evidence based upon lack of probable cause for Warrant Nos. 3 and 4 is denied.

## D. Defects/Omissions in Inventory Sheets

Primo alleges that the failure to issue separate inventory sheets for the searches executed pursuant to Warrant Nos. 1 and 2 violates Pennsylvania Rule of Criminal Procedure 209(A).[10] Furthermore, Primo asserts that the omissions on the inventory sheets prepared pursuant to Warrant Nos. 1 and 2, and 4 give rise to "constitutional questions". (Document No. 21, p. 12). Finally, the conflicting time-line reports regarding when the second search of apartment 5, 627 North Center Avenue, Somerset, Pennsylvania took place, and the search of the residence at 364 West Patriot Street, Somerset, Pennsylvania "rise above mere typographical mistakes ..., and constitute constitutional violations." (Document No. 30, p. 5).

### D.1. Standard of Review

53. Initially, the Court observes that when a federal court reviews law enforcement activities which are "state" undertakings in nature, in the context of a federal prosecution, the legality of a warrant issued pursuant to state law need only conform to federal constitutional requirements. *See United States v. Stiver*, 9 F.3d 298, 300 (3d Cir.1993) (evidence obtained in accordance with federal law is admissible in federal court even though it was obtained by state officers in violation of state law); *United States v. Bedford*, 519 F.2d 650, 654 (3d Cir.1975) (the test is "whether the fourth amendment's imperatives have been observed.").

54. In the case *sub judice*, the issuance of all four search warrants were undertakings of the Somerset Borough Police Department, i.e., state undertakings. Specifically, evidence obtained through the issuance of the four search warrants and the execution of those warrants by state officers did not include the presence or participation of federal officers.[11] *See U.S. v. One 1948 Cadillac Convertible Coupe*, 115 F.Supp. 723, 727 (D.C.N.J.1953). Accordingly, the evidence produced through the issuance and execution of search warrants one through four are entirely "state" undertakings. *Bedford*, 519 F.2d at 653 n. 1; Document No. 21, p. 12 n. 12.

55. While Primo concedes that the events involving the execution of four

---

10. Pa.R.Crim.P. 209 provides:
(A) Return With Inventory. An inventory of items seized shall be made by the law enforcement officer serving a search warrant. The inventory shall be made in the presence of the person from whose possession or premises the property was taken, when feasible, or otherwise in the presence of at least one witness. The officer shall sign a statement on the inventory that it is a true and correct listing of all items seized, and that the signer is subject to the penal-

ties and provisions of 18 Pa.C.S. § 4904(b)—Unsworn Falsification To Authorities. The inventory shall be returned to and filed with the issuing authority.
Pa.R.Crim.P. 209(A).

11. The Court also observes that there has been no evidence presented that there was an understanding or common practice between state and federal officers in the course of the operations executed by Somerset Borough Police on October 6 and 7, 2003.

search warrants on October 6 and 7, 2003 were state undertakings (Document No. 21, p. 12 n. 12), the violations of Pa. R.Crim.P. 209(A) and its "federal counterpart" Fed.R.Crim.P. 41[12], provide this Court with the authority to "fashion a remedy when the requirements of the Rule have been ignored." (Document No. 21, pp. 12–14).

**56.** The Court observes that whether evidence produced by state undertaking is admissible in federal court if it violates a state rule of criminal procedure is not determined by reference to the state procedural rule, but rather by Fourth Amendment analysis. *See United States v. Maholy,* 1 F.3d 718, 721 n. 4 (8th Cir.1993) (where court declined to apply state procedural law, Maholy argued that the court "should hold that the search violated Federal Rule of Criminal Procedure 41(c)(1), which states that search warrants shall be served in the daytime, unless the issuing authority, for reasonable cause shown, authorizes its execution at nighttime." [The court] decline[d] to apply Fed.R.Crim.P. 41(c)(1), however, to a search conducted entirely by state officers. *See United States v. McCain,* 677 F.2d 657, 662 (8th Cir.1982) (declining to apply Rule 41 unless the defendant/appellant could show sufficient federal involvement

in the search to justify invoking the "participation doctrine"); *cf. United States v. Moore,* 956 F.2d 843, 847 (8th Cir.1992) ("declining to apply the federal no-knock requirement of 18 U.S.C. § 3109 to a search conducted entirely by state officers)".

**57.** Accordingly, the Court determines that the Pennsylvania Rules of Criminal Procedure are not applicable to the case *sub judice.* The Court further determines that assuming, *arguendo,* that Pa. R.Crim.P. 209(A) did apply, the violations alleged by Primo would not implicate constitutional concerns such that the suppression of evidence would be an appropriate remedy.

**D.2. Alleged Violations of Inventory/Receipt Process**

**58.** Primo asserts that the following violations regarding the inventory/receipt process occurred during the execution of Warrant Nos. 1, 2, and 4:(1) Somerset Borough police officers failed to prepare separate inventory/receipt sheets for Warrant Nos. 1 and 2; (2) inventory sheets failed to include items 10 (silver Wal Mart key) and 11 (green vegetable matter) with regard to Warrant Nos. 1 and 2; (3) inventory sheet failed to include

---

**12.** Fed.R.Crim.P. 41 provides:
    (f) Executing and Returning the Warrant.
    (1) Noting the Time. The officer executing the warrant must enter on its face the exact date and time it is executed.
    (2) Inventory. An officer present during the execution of the warrant must prepare and verify an inventory of any property seized. The officer must do so in the presence of another officer and the person from whom, or from whose premises, the property was taken. If either one is not present, the officer must prepare and verify the inventory in the presence of at least one other credible person.
    (3) Receipt. The officer executing the warrant must:

    (A) give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken; or
    (B) leave a copy of the warrant and receipt at the place where the officer took the property.
    (4) Return. The officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.
Fed.R.Crim.P. 41(f).

item 7 (bag containing suspected cocaine) with regard to Warrant No. 4; and (4) time line inconsistencies reflected in the applications and inventory sheets give rise to the inference of improper searches conducted prior to the issuance of valid search warrants. (Document Nos. 21 and 30). Furthermore, Primo argues that Pa. R.Crim.P. 209(A) applies to the case *sub judice* as authority for the suppression of evidence obtained during the execution of the above warrants. *Id.*

59. The Court observes that when similar challenges to the admissibility of evidence have surfaced based upon violations of chapter 2 of the Pennsylvania Rules of Criminal Procedure, specifically Rules 208 and 209 where police while executing a search warrant failed to properly sign, witness or prepare an inventory and to provide a copy to the issuing magistrate, the Supreme Court of Pennsylvania interpreted the application of its Rules of Criminal Procedure as follows:

> [The] exclusion/suppression of evidence is not an appropriate remedy for every violation of the Pennsylvania Rules of Criminal Procedure concerning searches and seizures. It is only where the violation also implicates fundamental, constitutional concerns, is conducted in bad-faith or has substantially prejudiced the defendant that exclusion may be an appropriate remedy.

*Commonwealth v. Mason,* 507 Pa. 396, 406–407, 490 A.2d 421, 426 (1985). Such remedy is "properly employed where the objection goes to the question of the reliability of the challenged evidence ... or reflects intolerable government conduct which is widespread and cannot otherwise be controlled ...." *Mason,* 507 Pa. at 403, 490 A.2d 421 (*quoting Commonwealth v. Musi,* 486 Pa. 102, 115, 404 A.2d 378, 385 (1979)). Thus, the exclusion of evidence "that results from a search where there

has not been compliance with the rule must depend upon the relationship of the violation to the reliability of the evidence seized." *Id.* Additionally, "[f]ederal cases interpreting a comparable rule of criminal procedure, see Rule 41(d) of the Federal Rules of Criminal Procedure, have concluded that although important, the procedures required for execution and return of the warrant are ministerial and that irregularities should not void an otherwise valid search absent a showing of prejudice ...." *Id.* at 404, 490 A.2d 421 (*quoting Musi,* 486 Pa. at 116, 404 A.2d 378) (internal citations omitted).

60. Based upon the factual circumstances in the case *sub judice,* the Court determines that the imposition of a sanction requiring the suppression of evidence as a result of the above alleged violations regarding the inventory sheets, as well as the conflicting time reports, would be an improper remedy. Specifically, the Court determines that probable cause existed for all four search warrants based upon this Court's conclusion that the issuing magistrate's determination was consistent with the minimal substantial basis standard. Furthermore, the Court observes that based upon the factual record, testimony offered during the Suppression Hearing, and this Court's analysis, there is little dispute that the silver Wal Mart key, the green vegetable matter, and the bag containing suspected cocaine were all found on the premises described in the relevant warrants and seized pursuant to a valid search. Additionally, Primo has failed to establish that he was prejudiced from the violations of either procedural rule, Pa. R.Crim.P. 209(A) or Fed.R.Crim.P. 41, such that a request to suppress the evidence obtained through the execution of valid search warrants is warranted. *See Commonwealth v. Ryan,* 268 Pa.Super. 259, 263, 407 A.2d 1345, 1347 (1979) ("[t]he failure to file the inventory with the clerk

of courts office did not violate any of defendant's constitutional rights, did not invalidate the search warrant, nor did it affect its execution."); *Commonwealth v. DeGeorge*, 319 Pa.Super. 244, 466 A.2d 140 (1983), rev'd on other grounds, 506 Pa. 445, 485 A.2d 1089 (1984)(violation of former Rule 2009(a), now Rule 209(A), requiring return of an inventory of the items seized, does not require exclusion of evidence).

61. Accordingly, the Court determines that Primo's rights have not been prejudiced by the Somerset Borough police officer's failure to fully comply with the mandates of the procedural rules, and Primo's Motion to Suppress Evidence based upon violations of Pa.R.Crim.P. 209(A) and Fed. R.Crim.P. 41 is denied.